2021 IL App (2d) 180379
No. 2-18-0379
Opinion filed January 29, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1611 |
| PHILIP VATAMANIUC, | ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Schostok and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant, Philip Vatamaniuc, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 54 years' imprisonment. He was 17 years old at the time of the offense. Defendant appeals, arguing that (1) Robert Ritacca, one of the attorneys who represented him in pretrial proceedings, was ineffective for failing to properly inform him concerning the details of the State's 25-year plea offer prior to its expiration, and (2) his sentence is a *de facto* life sentence that violates the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We affirm defendant's conviction and reject his ineffective-assistance-of-counsel claim because defendant provided no independent, objective

confirmation that he did not timely accept the State's offer due to his counsel's erroneous advice. However, because the record bears no indication that the circuit court evaluated whether defendant was among the rarest of juvenile offenders whose crimes reflect permanent incorrigibility, we vacate his sentence and remand for a new sentencing hearing.

¶ 2                                    I. BACKGROUND

¶ 3     For clarity, before detailing the plea negotiations and the testimony of the witnesses at trial, we begin with a broad overview of the facts developed at trial. The evidence demonstrated that on the afternoon of June 3, 2013, defendant, age 17, and codefendants, Michael Coffee and Benjamin Schenk, ages 17 and 20, respectively, were together at Lauren Hahn's house, where they passed a firearm back and forth between them. Coffee called Colin Nutter, age 20, and set up a meeting with him to buy marijuana. The trio walked to the meeting spot and got into Nutter's blue Dodge Stratus when he pulled up. Coffee sat in the front passenger seat, Schenk sat in the backseat, behind Coffee, and defendant sat in the backseat, behind Nutter.

¶ 4     Within moments of the trio entering the vehicle, Nutter was shot in the back of the head and killed. Schenk and defendant put Nutter's body into the trunk. The trio then drove the Dodge Stratus to Hahn's house, where Schenk and Coffee cleaned the inside of it with bleach. They eventually drove to Schenk's residence, where they obtained towels, gardening gloves, and a shovel, before driving to a secluded spot where they dumped Nutter's body and covered it with leaves and sticks. Shortly thereafter, they returned to the area where they left Nutter's body and took his wallet. The body was found later that evening by a woman walking her dog.

¶ 5     Early the next morning, Schenk and Coffee used Nutter's key to enter his house while Nutter's mother was sleeping upstairs. They took marijuana from his dresser drawer, prescription medication for Nutter's dog from the kitchen counter, and a silver Ford Focus from the garage.

Police later located the Dodge Stratus on a street in Chicago, the Ford Focus in Hahn's driveway, and the murder weapon in Schenk's backyard, wrapped in a pair of men's briefs inside a bag of charcoal. The only fingerprint evidence was a single fingerprint that matched defendant, taken from the inside of the rear driver's-side window of the Dodge Stratus. Defendant, Schenk, and Coffee were all arrested within a matter of days in connection with the murder.

¶ 6    Defendant was indicted by a grand jury on multiple counts, including four counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2012)) (counts I through IV), three counts of armed robbery (*id.* § 18-2(a)(2)) (counts V, VI, and VII), two counts of unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2012)) (counts VIII and IX), and one count of concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 2012) (count X). Schenk and Coffee were similarly indicted. The State nol-prossed the counts of armed robbery, unlawful possession of a stolen vehicle, and concealment of a homicidal death, and the case proceeded to trial against defendant on the four counts of first-degree murder.

¶ 7                           A. Pertinent Pretrial Proceedings

¶ 8    On August 23, 2013, defendant and his counsel, Robert Ritacca, appeared before the circuit court and requested a plea conference pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012). The State agreed to participate in the Rule 402 conference, but it noted that it needed to conduct further investigation before it could settle the case. The court explained to defendant what a Rule 402 conference entailed, and defendant confirmed that he wanted the conference to proceed. The court then held a Rule 402 conference with the prosecutor and defense counsel, off the record.

¶ 9    On August 28, 2013, the circuit court advised defendant at length concerning what was discussed at the Rule 402 conference, including its understanding of the underlying facts of the case. Pertinently, the court told defendant that Ritacca asserted that defendant, Schenk, and Coffee

got into Nutter's vehicle, that defendant "saw Schenk pull out a gun and point [it] diagonally towards the driver and pull the trigger," that Schenk asked defendant to help put the body in the trunk, and that, after leaving the body on the roadside, defendant covered it with leaves. The court also stated that Ritacca informed it that "no one in any of the evidence that he has to present would show that [defendant] had a gun" and that "[t]here's no *** information that [defendant] or Mr. Coffee knew about the gun" prior to the shooting. The court also stated that it was advised that "there is a person in the jail who indicated that he had separate conversations with [defendant] and Schenk" and that "Schenk had bragged about doing the shooting."

¶ 10    Defendant agreed that the court's summary of the conference matched what Ritacca told him. The State informed the court that it had started negotiations with Ritacca but that further investigation was still needed. The prosecutor stated that any agreement would require a proffer from defendant and truthful testimony against Schenk and Coffee and that, in exchange, the State would drop the first-degree murder charges and offer "something along the lines of an armed robbery based on the dangerous weapon with a consecutive conceal[ment] of a homicidal death." The prosecutor stated that Ritacca advised him "that he would not take anything in the teens and that the defendant's father [did] not wish his son to do any time. Therefore, that ended our conversation." Ritacca agreed with the State's summary of their conversation and stated that he was "still in the same position, that [he had not] heard anything agreeable for this defendant." He continued that he "wish[ed] to proffer [and] give the State [defendant's] statement, and if that doesn't sway the State in any way *** [he] wish[ed] to go to trial on this matter." Nevertheless, Ritacca agreed to continue negotiating with the State.

¶ 11    On September 9, 2013, the prosecutor informed the court that there was a "breakdown in negotiations." Ritacca indicated that he wished to continue negotiations and stated that he was

"antsy to try to resolve this matter." Two days later, on September 11, 2013, the prosecutor informed the court that plea negotiations had resumed but that they were "still at opposite ends."

¶ 12     On September 13, 2013, the court confirmed with defendant that Ritacca had informed him of the possibility of an additional conference, and defendant indicated that he wished for the attorneys and the court to engage in another conference. Accordingly, the parties conducted a second Rule 402 conference off the record.

¶ 13     The State tendered a written plea offer to Ritacca on September 15, 2013. The offer appears in the record and provides that, in exchange for defendant's truthful testimony against Schenk and Coffee, the first-degree-murder and motor-vehicle charges would be dismissed and that defendant would plead guilty to "Armed Robbery—20 years imprisonment based on a 'dangerous weapon' to be served at 50% followed by Concealment of a Homicidal Death—5 years imprisonment @ 50% to be served consecutively so that the actual time served after good-time credit is approximately 12 ½ years." It also stated that, "if the defendant does not accept this offer by the pretrial date, or there are any pre-trial motions requiring evidentiary testimony, the offer will automatically terminate." The offer also indicated that the State reserved the right to revoke the offer "should relevant information concerning this offense or defendant arise prior to the completion of the plea."

¶ 14     On September 16, 2013, the prosecutor informed the court that he gave Ritacca the written offer the prior day. Ritacca confirmed that he informed defendant as to what transpired at the September 13, 2013, conference. He also acknowledged that he received the State's offer and that he discussed it with defendant and defendant's father, Daniel Vatamaniuc, but he stated, "I don't understand it, judge, the way that it is written." The court replied that it had not seen the offer and would not "get involved in that." It advised Ritacca to discuss it with the State.

¶ 15    The court proceeded to advise defendant what transpired during the second Rule 402 conference, including additional facts of which it was apprised. Pertinently, it stated that it was informed that defendant, Schenk, and Coffee were at Hahn's house prior to the shooting, that Schenk and Coffee passed a gun back and forth, as well as loaded and unloaded it, and that Schenk had discussed robbing a drug dealer before they left to meet Nutter. The court also informed defendant that "the State had talked about a plea on the armed robbery as well as a consecutive plea on the concealment of a homicid[al] death. *** The court discussed between 15 and 18 years and indicated that the defense and the State should continue talking." Defendant acknowledged that Ritacca discussed these developments with him.

¶ 16    Ritacca then explained that his confusion stemmed from his belief that the sentences should run concurrently, but the trial court replied that it agreed with the State that, following a legislative amendment, the sentences should run consecutively. Ritacca also indicated that he was confused that the offer did not include a mandatory supervised release (MSR) term, to which the court explained that the MSR is based on the class of the offense, so that "if it is a plea on a Class X or Class 1, you know what the mandatory supervised release statute says." Ritacca agreed in that regard, and the court told the parties to step away and "discuss that." Ritacca answered that he did not "want to discuss it at [that] particular time" because he was "very, very upset" with how the State was proceeding. The court replied, "well, Mr. Ritacca, you might be upset, but you have a duty to discuss this offer with your client." He replied that he "discussed—," at which point the court interrupted him and said, "if you don't understand it, you can't discuss it with your client. If you [would] like a minute to discuss that so you can again talk to your client about that, that's fine. We will pass the case." The record does not indicate that the case was passed, and Ritacca moved on and discussed other matters.

¶ 17    On September 27, 2013, at the next court date, the prosecutor informed the court that he and Ritacca "spoke at some length about what that offer actually meant and that's as far as [they] got." After the court handled other issues raised by the parties, the prosecutor stated that, on October 1, 2013, he was going to "tender a formal deadline date for the offer that's already been tendered." He continued, "I just wanted to put that on the record. October 1st." Ritacca replied, "[t]here is no offer here. There is no offer here[,] *** Judge, you can't give this guy an offer if it's false." The court told Ritacca to step out of the courtroom, and the proceedings ended.

¶ 18    At a status hearing on October 1, 2013, the prosecutor stated, "in all fairness to Mr. Ritacca's client, judge, we will keep that written offer that we did tender open until October 21st. After that, the offer will be withdrawn." Ritacca replied, "in terms of the written offer that they gave me, it's not correct, Judge, in terms of my calculations, in terms of the charges, in terms of the numbers, [and] in terms of the dispositions in this matter." The court directed Ritacca to discuss that with the State and return on October 21. He responded, "I've been discussing it until I'm blue in the face." The court stated that if Ritacca wanted to have another Rule 402 conference, he could bring that up at the next court date.

¶ 19    On October 21, 2013, at the next court date, there was neither any mention of the plea offer nor any indication that either party wished to engage in another Rule 402 conference. Instead, Ritacca requested hearing dates on a motion he recently filed, which the court obliged. As the State points out in its brief, the motions were subsequently litigated, including a multi-day evidentiary hearing on defendant's motion to suppress.

¶ 20    More than six months later, on May 8, 2014, Ritacca filed a motion to enforce the plea agreement. Therein, he asserted that the State "made a formal offer to the defendant which has been previously accepted and is still pending and has not been rejected" as well as that "defendant

has excepted [*sic*] the offer and the Court's exception [*sic*] should be allowed and the court should mandate the State to further comply." He also pointed out that defendant has a right to the effective assistance of counsel during plea negotiations.

¶ 21     The circuit court held a hearing on the motion on June 10, 2014. Ritacca stated that the State gave him a plea offer, that he "gave it to this defendant, *** this defendant had accepted it, *** [and] never rejected any type of plea negotiations in this matter." He also asserted that the offer did not automatically terminate, that he did not bring forward any witnesses to testify "evidentiary-wise," and that the State had not discovered any new evidence that would have caused it to withdraw the offer. In response, the State pointed out that there was a multi-day evidentiary hearing on defendant's motion to suppress. It also relied on the transcript from the October 1, 2013, proceedings, wherein the prosecutor stated that the offer would be kept "open until October 21st. After that, the offer will be withdrawn," and it stressed that nothing in the October 21, 2013, transcript indicated that the defense wished to accept the offer. The State further argued that, even if the offer had not lapsed, it would have withdrawn the offer on November 12, 2013—when it interviewed and obtained the written statement of a witness who stated that defendant confessed to him that he was the shooter. It argued that, even otherwise, the court would not have accepted the plea after receiving the witness's written statement. The State further highlighted that it had not yet interviewed the witness when the parties engaged in the Rule 402 conferences.

¶ 22     The circuit court denied defendant's motion to enforce the plea agreement, reasoning that the offer lapsed on October 21, 2013. It also rejected Ritacca's assertion that it had not litigated any evidentiary matters, noting that Ritacca elicited testimony from two detectives, defendant, and Daniel in November 2013. The court then explained to defendant that there could be an issue with Ritacca continuing to represent him if defendant wished to allege that he was ineffective in

handling the plea negotiations. The following exchange occurred:

"THE COURT: Now, this Court does not consider this a game. And, Mr. Ritacca, if there are issues with regard to your unprofessional conduct in this matter, it takes it a step further because then the Court is in a position where it may have to report this to the Attorney Registration and Disciplinary Committee [*sic*].

MR. RITACCA: That's fine, Judge.

THE COURT: And I'm not suggesting at this point that that's where I am, but that's where this is headed. And so, if that is what you're suggesting, I now believe that [defendant] has the right to have another attorney. And so I will pass this, and he can \*\*\* discuss it with you, Mr. Ritacca, if that's what he wishes to do and continue with this. That's up to you and your client at this point."

After a brief recess, defendant informed the court that he wanted Ritacca to continue to represent him. As such, the court determined that Ritacca had not provided ineffective assistance of counsel, reasoning that defendant had not suffered any prejudice.

¶ 23    On June 17, 2014, the circuit court granted the State's motion to disqualify Ritacca as defense counsel due to a conflict of interest that stemmed from his representation of a State's witness in defendant's case in an unrelated criminal matter. The conflict arose between Ritacca and defendant after all the foregoing described plea negotiations occurred. Ritacca filed a motion for leave to file an interlocutory appeal, which this court denied in a minute order on August 14, 2014. Defendant thereafter retained new counsel, attorney Patrick Quilty, who represented him through the trial.

¶ 24                                B. The Trial

¶ 25    A four-day bench trial was held in April 2017. Samantha Dela Cruz testified that, on the

evening of June 3, 2013, she walked her dog along Frontage Road in Skokie and observed what "could possibly be a mannequin" laying in some overgrown shrubs. She walked home and returned to the area with her mother, Rebecca Dela Cruz. Rebecca testified that her daughter directed her to a weeded area, where she observed a leg that "looked like it was bent unnaturally." She also saw a torso and "a little bit of the face" through the brush. She called 911.

¶ 26    Francisco Martinez Sr. testified that he owned a .40 caliber semiautomatic handgun that he kept in a case on the top shelf of a closet in his Highland Park home. He had two or three magazines for the handgun and a case of hollow-point bullets. He stored the magazines in the carrying case and the box of hollow-point ammunition next to the case. He and his wife were out of town from May 27 to May 31, 2013, leaving their son, Francisco Martinez Jr., at home. On June 6, 2013, several Highland Park police officers came to Martinez Sr.'s home and inquired about his firearm. He invited the officers inside and went to the closet to show them where he kept it, only to discover that his firearm and all the ammunition were missing.

¶ 27    Martinez Jr. testified that, during the week of May 27, 2013, while his parents were out of town, some of his friends came to "just chill" at a week-long gathering he had at his house. They spent their time "drinking, smoking cannabis, listening to music, free styling to instrumentals, and watching T.V." Among the people who visited his house at various times during the week were defendant, Nutter, Schenk, Coffee, and Daniel Valentine. While at the gathering, Nutter mentioned his ability to procure marijuana. On May 30, 2013, Coffee was alone in the house for approximately five hours while Martinez Jr. was at work.

¶ 28    Martinez Jr. testified that he missed a call from Schenk's phone number on June 3, 2013. He returned the call later that evening, but defendant answered the phone and stated that they were in Chicago and could not make it back to the Highland Park area. Two days later, on June 5,

Martinez Jr. picked up defendant from school after one of his finals. Defendant directed them to a house where they picked up some marijuana, and they returned to Martinez Jr.'s house to smoke it. Afterward, Martinez Jr. dropped defendant back off at school. When Highland Park police officers questioned him at his house on June 6, he "had no clue" that his father's firearm was used to kill Nutter.

¶ 29    Lucas Carlson testified that on May 31 or June 1, 2013, Coffee came to his residence with a group of "somewhere between four and seven" people whom he did not know. He could not recall if defendant was with them, but he acknowledged that when he reported the incident he told the police that defendant was present. Coffee brandished a firearm and asked Carlson if they could come inside. Carlson let the group in because he feared for his life. Coffee had a backpack with him, and he showed Carlson several firearm magazines and some ammunition. The group sat in his living room "chit chatting" for a few minutes. Carlson was "on drugs at the time" and "was nervous." He cut into their conversation and asked them if they would leave if he let them empty an entire magazine into his wall. Coffee then fired the gun several times into the wall near where the wall met the ceiling. The group laughed for about a minute, then left. Police later recovered three bullets from Carlson's wall, and forensics determined that they were fired from the same firearm that was used to kill Nutter.

¶ 30    Luis Ramos and Oscar Hernandez testified that late on the evening of June 2, 2013, they drove to a house in Highwood to pick up Oscar's friend. As they waited in the car for the friend to come outside, Coffee, Schenk, and defendant, with whom they were familiar, approached the vehicle. Coffee stated that they "were running" because they had "heat," and he lifted his shirt up and revealed to Ramos a firearm in his waistband. Defendant stood about one foot away from Coffee when he revealed the gun. Defendant said nothing and kept to himself. Hernandez, who

was in the driver's seat, "couldn't really see anything," but he looked at Coffee when he told Ramos that he had a gun, and he saw Coffee "pretty much [do] the motion of look, you know, like we have this [gun]." Schenk then began to look agitated, and he pulled Coffee aside, where they exchanged words. Ramos could not hear what either individual said. Coffee asked Ramos and Hernandez if they wanted to hang out, but they declined.

¶ 31     Hahn testified that, in 2013, she lived in a home on Oakridge Avenue in Highwood. She met Schenk, Coffee, and defendant in 2013, and they came to her house almost every day after school, including on June 3, 2013. That day, at approximately 11 a.m., Schenk and Coffee arrived at her house, and Coffee had a gun. They had brought a gun to her house before that day, "probably" more than one time. They went into her living room and "were taking the gun and passing it around and emptying the bullets and taking the [clip] out." While Schenk and Coffee were handling the gun, Hahn "was trying to pay attention [to the] T.V."

¶ 32     Hahn testified that defendant arrived at her house at approximately 2 p.m. Defendant sat on the couch next to her for a while. He eventually took the gun from Schenk, emptied the bullets into the hooded sweatshirt he was wearing, and then put the bullets back into the gun. She told them to "get that thing out of my place," but they did not leave right away. Defendant had the gun when the group eventually left.

¶ 33     Hahn further testified that Schenk, Coffee, and defendant returned to her house later that evening. Either Coffee or Schenk stated that defendant had cut his ear and asked her for bleach. She went outside to see defendant, but she did not observe a cut. She gave them a bottle of bleach and "saw them taking the [trunk] carpeting in and out of a car." She later found carpeting and blood inside the garbage cans that she kept along the exterior of her house.

¶ 34     Hahn testified that, the following day, Schenk and Coffee returned to her house in a silver

car. She thought defendant was also there, but she was "not 100 percent sure." She asked them to get the vehicle out of her driveway because that side of the driveway was not hers. She saw Schenk take a baseball bat and strike the car window three times. She watched from her window, but not for "too long," because she did not want to see what was going on and "probably" knew "something was bad."

¶ 35    Frances Pieri, Hahn's next-door neighbor, testified that on the afternoon of June 3 or June 4, 2013, she saw a car in Hahn's driveway that she had not seen before. Through the window of her laundry room, she observed a white male wiping down the interior of the vehicle while wearing gloves. The white male she observed was not defendant. She also saw another white male, a black male, and Hahn in the driveway "watching this man in the car." Pieri tended to some household duties and later observed "this same young man that was in the car wiping it down" use a baseball bat, "hitting it against the windows trying to get into the car." The car window did not break, and the individual went into Hahn's home. Later, at approximately 4 p.m., she observed a white male and a black male get into the car and drive away. The white male was not the same individual she observed cleaning the interior of the vehicle.

¶ 36    Nutter's parents, Michael and Angie Nutter, both testified. On June 3, 2013, at approximately 4:30 p.m., Nutter left home in his Dodge Stratus. He told Angie that he was going to hang out with friends. After the Nutters came home from shopping that evening, Angie placed the keys to their Ford Focus on the kitchen counter. She tried to call Nutter on his cell phone at approximately 8 p.m., but he did not answer. She called him several more times before she went to bed, but she was unable to reach him. At approximately 4:15 a.m. the next morning, Michael left their house and walked to the train station to go to work in Chicago, which was his normal routine. Between 5 and 6 a.m., Angie heard "a very audible sound," "like a 'click' or something

falling," but she did not go downstairs to investigate it. At approximately 6:30 a.m., Mrs. Nutter went downstairs and saw that the Dodge Stratus was not in the garage, nor was the Ford Focus. She also noticed that the keys for the Ford Focus and three prescription medication bottles for their dog were missing from the kitchen counter. Angie then called the police to report that her son was missing. Police arrived at her home soon after and informed her that they had found her son's body.

¶ 37     Sergeant Solveig Gehrken of the Wilmette Police Department testified that on the evening of June 4, 2013, he responded to Hahn's residence after police located the Nutters' Ford Focus parked in her driveway. He observed bloody footwear impressions on the driveway, as well as blood stains on the sidewalk that led from the driveway to the side of the house, where several garbage cans were situated. A pressboard from the trunk of a vehicle was leaning against one of the cans, and he observed a blood stain on one corner of it. He also found a carpet liner inside one of the garbage cans, and he recognized it as something that looked like it came from the trunk of a vehicle. He also found inside one of the garbage cans a second pressboard, a hospital disinfectant bottle, a plastic bag filled with carpet remnants, and a prescription bottle for Michael, from an animal hospital for a dog. All these items had blood stains on them. He also examined the Ford Focus in the driveway, which was locked and had keys in the ignition. He noted damage to the driver's-side front window as well as damage to the rear bumper. He also recovered from inside Hahn's residence a license plate registered to the Nutters' Ford Focus.

¶ 38     Nicholas Pacileo testified that he was 13 years old at the time of the offense. On June 3, 2013, he visited his friend, Reno Vanderpal, at his house. Schenk was renting a room from Reno's mother, Diane Vanderpal. Pacileo observed Coffee, Schenk, and defendant pull up to Vanderpal's house in a "dark color" car. He went outside with Vanderpal and observed Schenk go inside the

house "to grab stuff," including "towels and gloves and stuff like that, gardening supplies, basically." He also saw defendant retrieve a shovel from the side of the house and put it into the back seat of the vehicle. Pacileo walked up to the side of the vehicle the group arrived in. The vehicle's trunk was open, and he observed blood, towels, and feet. He and Vanderpal then went into the garage and "acted like nothing happened because [he] was 13 and never really experienced stuff like that."

¶ 39    Valentine testified that he and defendant had been friends since they were 11 or 12 years old, and he thought of defendant like a brother. Together, they used to "chill, walk around, rap, smoke, skate, little bit of everything." Valentine considered himself a "rap artist," and defendant also liked to rap. Valentine met Coffee through defendant less than a year before the events of June 2013. Valentine was also familiar with Schenk.

¶ 40    Valentine testified that, on the morning of June 4, 2013, defendant and Coffee "just showed up" at his house while he was playing basketball in his driveway. Neither defendant nor Coffee joined him playing basketball, which Valentine thought was very unusual. After about 30 minutes, they went into the garage, where they smoked marijuana and "started rapping, putting on an instrumental." Defendant rapped "some lyric about a gun." Valentine testified that he could not "exactly remember what he said, but [he] just, like, didn't believe what he said, so [he] called him out on it." Defendant and Coffee then "started talking about what they—what happened that night that they killed Colin." Valentine testified that he could not "really remember exactly what [defendant] said," but he stated that he remembered what he included in the handwritten statement he had subsequently prepared. He noted that his "statement says that [defendant] pulled the trigger," but he testified that "that doesn't sound like [defendant], doesn't sound like something he would say." Valentine further testified that he thought defendant said, "we did it," and then Coffee

loudly said "bang!" Valentine asked them "questions like who did this happen to, where did it happen, why, and all that." Defendant told him what kind of gun was used, and Valentine "believe[d] he said .44." Defendant also stated that he sat behind Nutter when he was shot. Coffee stated that he was in the front passenger seat and Schenk was seated behind him. Valentine testified that defendant then told him that he and Schenk put Nutter's body in the trunk, dumped it on the side of the road, and covered it with leaves and sticks. Valentine then "called them all idiots and told them that they had to leave [his] house."

¶ 41    Valentine further testified that investigators went to his house and asked him if he had any information about the homicide. He "declined to speak with them" because he "just didn't want to." Valentine testified that he was subpoenaed by the Lake County State's Attorney's office in November 2013, and he prepared a handwritten statement concerning the statements that defendant and Coffee made to him on June 4, 2013. Valentine's handwritten statement, dated November 12, 2013, appears in the record. It states, pertinently: "[Defendant] said he had put the gun to Colin's head and pulled the trigger. *** I asked [defendant] what happened[,] and he said his head didn't splatter." During his testimony, Valentine noted that he had not slept in three days when he prepared the statement, and he begged the police to allow him to provide the statement later.

¶ 42    Detective Sergeant Joe Kopecky of the Wheeling Police Department testified that he found the Nutters' Ford Focus backed into Hahn's driveway on June 4, 2013. He parked nearby to watch the vehicle and observed Hahn come out of the house to meet Schenk, who was wearing gloves and carrying a baseball bat. After Schenk and Hahn spoke for a few minutes, Schenk pushed the Ford Focus back several feet, toward the garage, and struck the driver's-side window several times with the baseball bat. The window did not break. Schenk then went into Hahn's house and came

out alone several minutes later, without the gloves and the baseball bat. Schenk proceeded to walk down the street whilst talking on his cell phone, at which point he was arrested by other detectives in the area.

¶ 43    On June 29, 2015, Schenk entered into an open plea agreement wherein he agreed to testify truthfully against defendant in exchange for a plea to murder, with a sentencing range of 20 to 60 years. Schenk testified that he was 20 years old at the time of the offense and had been friends with defendant since the summer of 2011. They hung out together nearly every day, "playing video games, smoking weed, drinking [alcohol], [and] sometimes stealing stuff." He met Coffee through defendant in 2012. He spent time with Coffee on many occasions, although he was better friends with defendant than he was with Coffee. He did not really know Nutter, but he had previously purchased marijuana from him through an intermediary.

¶ 44    Schenk testified that on the morning of June 2, 2013, he received a loaded .40 caliber firearm from Coffee. He was contemplating purchasing it from Coffee and "thinking about ending [his] life with it." Schenk brought the gun with him to work at an Ace Hardware on June 3, 2013, and kept it concealed in his waistband. He received a phone call from Coffee during his shift, after which he left work early. He met Coffee at a specified location and gave him the gun back.

¶ 45    Schenk and Coffee walked to Hahn's house and arrived at around noon. They sat in her living room and "just kind of hung out, [and] watched T.V." Defendant arrived at Hahn's house approximately 90 minutes later. Defendant picked up the gun from a table and began to play with it, "jacking the bullets out of the magazine, wiping them, [and] putting them back in." He did that "off and on" over the course of about three hours. Schenk also took hold of the gun a few times. He "[j]ust looked at it, jacked [a bullet] around in and out of the chamber, [and] put it back in." Coffee similarly took the gun and did the same thing.

¶ 46    Schenk testified that Coffee initiated a conversation about who they could rob to obtain drugs and money, and Nutter's name came up. Coffee called Nutter and arranged a meeting. Coffee then picked up the gun, and they left Hahn's house on foot to meet Nutter. As they walked, Coffee stated that he wanted to go to the west side of Chicago and that they needed a car. Schenk replied that Nutter was not going to drive them there, and Coffee stated that they were "going to have to kill him." Coffee stated that Schenk had already "proved" himself and, as he passed the gun to defendant, stated that it was "Phil's turn." Defendant and Coffee then began "bandying Four Corner Hustler [(gang)] slogans back and forth" and "fist bumped."

¶ 47    Schenk testified that they arrived at the meeting location before Nutter. Schenk distributed to Coffee and defendant black cotton gloves that he had stolen from work, and they put the gloves on. Nutter pulled up in his Dodge Stratus approximately 5 to 10 minutes later, and the trio got into the vehicle. Coffee entered the front passenger seat, defendant sat behind Nutter in the backseat, and Schenk sat in the rear passenger's-side seat. Music was playing in Nutter's car, and Coffee said, "this is my shit," and turned the volume up. Coffee then screamed "do it!" Nutter turned his head to look at Coffee, and defendant shot Nutter in the back of his head. Coffee opened the trunk, into which Schenk and defendant put Nutter's body. Coffee then got into the driver's seat and drove them back to Hahn's house, where Coffee and Schenk cleaned the inside of the vehicle with bleach.

¶ 48    Schenk testified that, while Nutter's body was still in the trunk of the Dodge Stratus parked in Hahn's driveway, he, defendant, and Coffee smoked marijuana inside Hahn's house for about two hours. Defendant was also "playing with the gun a little bit, but not as much as before." The group eventually departed Hahn's house in the Dodge Stratus. Coffee drove the vehicle, and they picked up shovels from Vanderpal's residence, where Schenk was renting a bedroom. They

proceeded to drive toward the west side of Chicago, but they "began to get nervous about driving around with a body in the trunk." They pulled off the road and threw into a dumpster a bag that contained their gloves, the spent shell casings from the firearm, and other items. They then drove around in search of a spot to leave the body. Coffee identified a secluded area, and defendant and Schenk removed the body from the trunk, laid it in some brush, and covered it with leaves. They did not use the shovel to bury the body, because they feared being seen.

¶ 49    Schenk testified that they next continued driving, only to return to the scene where they left Nutter's body, to take his wallet. It took them "a while" to find where they had dumped the body, because they "did not know the area" and "were unsure where it was, exactly." Coffee took $200 in cash from the wallet, and Schenk threw Nutter's various cards and other items from the wallet out the car window as they drove on the expressway. When they arrived in Chicago, they drove around for several hours. While there, Coffee used some of the money he took from Nutter's wallet to purchase cocaine for defendant and Schenk, which they snorted. They returned to Hahn's house, left the Dodge Stratus in her driveway, and parted ways.

¶ 50    Schenk further testified that, at 5 a.m. the next morning, he and Coffee burglarized the Nutters' house. They drove there in the Dodge Stratus and used Nutter's house key to enter the home. Coffee took a "big Tupperware thing full of marijuana" from a drawer in Nutter's bedroom, and Schenk put on a hooded sweatshirt that he took from the bedroom because he was "jittery and cold" since he "had been taking a lot of pills and snorting a lot of cocaine." They proceeded into the kitchen, and Schenk took pill bottles from the kitchen counter. Coffee handed him the keys to the Dodge Stratus and took some keys from the kitchen counter. Schenk and Coffee then left the house and returned to Hahn's house; Schenk drove the Dodge Stratus while Coffee drove a Ford Focus that he took from the Nutters' garage.

¶ 51 Schenk testified that, later that day, he, Coffee, and defendant drove back to Chicago. He drove the Dodge Stratus while defendant and Coffee drove the Ford Focus "pretty fast," "weaving in and out of traffic." While they were driving in Chicago, the Ford Focus stopped suddenly, and Schenk rear ended it with the Dodge Stratus, which "took that car out of commission." They left the Dodge Stratus parked on the street, and Schenk entered the Ford Focus. The three individuals then "drove around the west side for a little bit" and then returned to Hahn's house. They parked the Ford Focus in Hahn's driveway. Schenk testified that he later realized that the keys to the Ford Focus were left in the ignition and locked inside the vehicle. He retrieved a baseball bat from inside Hahn's house and struck the vehicle's window with it several times. He was unable to break the window, so he left. As he walked "to Walgreens to get some cigarettes and some food," he was arrested in connection with Nutter's murder.

¶ 52 Defendant did not testify, but a video recording of his June 6, 2013, custodial interrogation by police was entered into evidence. In the interview, defendant initially denied any involvement in the homicide. He told the police that, on the day in question, he was at the beach with his ex-girlfriend until approximately 4 p.m., after which he went to Valentine's house, where he played basketball and smoked marijuana with friends until sometime between 10 p.m. and midnight.

¶ 53 Defendant's explanation regarding his whereabouts on June 3, 2013, changed once police told him that Schenk and Coffee were also being questioned and that "everybody's talking." Defendant then told investigators the following. He, Schenk, and Coffee were at Hahn's house after school on June 3, 2013, and they left to buy marijuana from Nutter. Once Nutter pulled up to the meeting spot, they got into his car. He sat behind Nutter, who was in the driver's seat, Schenk sat next to defendant in the rear passenger-side seat, and Coffee sat in the front passenger seat. Schenk told Nutter that he did not have any money on him and he needed to get money to pay for

the marijuana. Defendant did not see the gun before they got into the car, and it surprised him when Schenk shot Nutter. He was "in shock" after the gun went off. It was daylight at the time, and he "was just being quick" when he helped Schenk put the body in the trunk, out of fear of being seen.

¶ 54    After he helped Schenk put the body in the trunk, defendant said "[d]rop me off, man. I don't want to be part of this shit."  When they returned to Hahn's house, he was "freaking out [and] smoked a cigarette" on the living room couch while Schenk and Coffee cleaned the inside of the car. He saw Schenk get a garbage bag from under the kitchen sink and bring it outside, into which Schenk put dirty towels. Coffee told him that Schenk had pointed a gun at him "at some point" and threatened him, but defendant could not remember when.

¶ 55    Defendant stated that Schenk then decided that they needed to get rid of the body. He could not remember who picked the spot to leave the body or why the spot was chosen. Defendant stated that he "had to get the head part" because Schenk had already "grabbed the feet," and defendant "got [Nutter's] fucking blood all over [his] hands." He and Schenk lifted the body out of the trunk and covered it with leaves.

¶ 56    Defendant stated that they drove around for about an hour before they returned to take Nutter's wallet—Schenk retrieved it and stated that he wanted to look at his driver's license to find out where Nutter lived. Defendant also remembered that Schenk took a house key from Nutter's key ring. As they drove on the expressway to Chicago, Schenk threw Nutter's various cards out the window. They "went to the city for a bit, and after that [they] did come back and [Schenk and Coffee] did drop [defendant] off at home."

¶ 57    Defendant stated that he went to Hahn's house the next day, and it was then that he first saw the Nutters' Ford Focus. He said he "didn't want to go" to Nutter's house, because he "had a

bad feeling about that" and "didn't want to be a part of it." He stated that Schenk "wanted to get more and [was] getting greedy." Schenk told him that he stole the Ford Focus from the Nutter house, and defendant went home because he "want[ed] it to stop."

¶ 58    At trial, the parties entered several stipulations, including that Michael Ferrill testified before the grand jury that he had a conversation with Schenk on June 7, 2013, while they were in the Lake County jail. Schenk told him that "he had shot the Asian kid *** and he was going to blame the other white kid in the case." Schenk also told him that he was an "army brat," had received weapons training, and used an FNH .40 caliber firearm in the shooting. A partial copy of the transcript of the testimony was attached to the stipulation. It was further stipulated that information concerning the make and caliber of the firearm was not publicly available at that point.

¶ 59    Following closing arguments, the circuit court found defendant guilty on all four counts of first-degree murder. However, the court concluded that it could not find beyond a reasonable doubt that defendant "was the actual shooter," pointing to (1) defendant's statement to investigators that Schenk was the shooter; (2) Schenk's testimony that "he entered a plea and for that plea the enhancement of 45 years to life was withdrawn, that he pled to 20 to 60 years even though at 100 percent and he had to testify truthfully;" (3) Schenk's statement to Ferrill that he shot Nutter and was going to blame the "other white kid;" (4) Ferrill's knowledge of details about the murder weapon that were not then publicly available; and (5) the fact that the murder weapon was found at Schenk's residence. Notwithstanding, it found that defendant, or one whose conduct he was legally responsible for, was armed with a firearm at the time of the offense. The court commented that "the penalties for said offense [are] an additional 15 years of imprisonment" and that, "based on all the evidence that has been presented, the Court finds that the defendant was armed with a firearm."

¶ 60                                  C. Posttrial Proceedings

¶ 61    Following his conviction, defendant retained new counsel, attorney Renea Amen, for posttrial proceedings. On December 29, 2017, defendant filed a motion to vacate the judgment or, in the alternative, for a new trial. He argued, *inter alia*, that Ritacca was ineffective for failing to advise him of the details regarding the State's 25-year guilty plea offer prior to its expiration.[1] Specifically, he asserted that Ritacca failed to advise him concerning the conditional nature of the State's plea offer—namely that it would be withdrawn if not accepted by the pretrial date or if he litigated any evidentiary motions. Defendant asserted that the State withdrew the offer after "the conditions were violated." Moreover, he asserted that Ritacca did not understand the offer, as demonstrated when he told the court on September 16, 2013, "I don't understand it, Judge, the way that it is written." Pointing to defendant's affidavit, the motion further alleged that, "[i]f the [d]efendant was properly explained the offer and all the conditions in a meaningful manner and with enough time, [he] would have accepted the offer." In defendant's affidavit attached to the motion, he averred, pertinently, that (1) he was "not told of the offer of 25 years to be served at 50% (good time credit) until either the day before or the day the offer was withdrawn;" and (2) he was "never told by [Ritacca] that the filing or running of [m]otions could cause the State to withdraw any potential offers or not make any offers based on the filings and running of [m]otions."

¶ 62    The court held a hearing on the motion on March 1, 2018. Defendant testified that Ritacca told him "briefly" about the State's offer of 25 years but that Ritacca stated, "we're not taking

---

[1] Defendant also alleged that his trial counsel, Quilty, was ineffective. Defendant does not raise this argument on appeal.

that" and "things would get better." Ritacca brushed aside any questions defendant asked about the offer, and he moved on to the next topic. Defendant also testified that Ritacca did not inform him that the sentence could be served at 50% with good-time credit and did not mention that the State would rescind the offer if not accepted by the pretrial date or if any evidentiary motions were filed. Defendant stated he would have accepted the State's offer had Ritacca advised him in full about its details and the conditions attached to it. Defendant learned the details about the offer "one day in court when [he] believe[d] that [Ritacca was] filing a motion." He saw the offer while he was seated at counsel's table.

¶ 63    Ritacca also testified at the hearing. He stated that, following the Rule 402 conference on September 13, 2013, he received an offer from the State and shared it with defendant and Daniel. At the time, he explained to defendant that "[t]he offer was that the murder was going to be dismissed, that [defendant] was going to plead guilty to an armed robbery and *** concealment of a [homicidal death]. *** In total, the bottom line of that was about [a] 12 year[ ] sentence." He testified that he did not tell defendant about a deadline after which the offer would expire, because it was an "open offer" and "there was no deadline." Ritacca further testified that he did not tell defendant that the offer would be revoked if any evidentiary hearings were litigated. In explaining his apparent confusion regarding the offer in court on September 16, 2013, he testified that his comment was taken out of context, and he stated that he did not understand why the written offer differed from the court's recommendations following the Rule 402 conference as well as that he was confused about the absence of a specific MSR term in the offer. When asked whether he recalled the October 1, 2013, status date—when the State extended the deadline for the offer to October 21, 2013—Ritacca responded, "could have, yes."

¶ 64    The circuit court denied the motion following oral argument. In addressing the ineffective-

assistance-of-counsel claim, the court concluded that defendant was unable to establish prejudice, noting that, although Ritacca indicated in some instances that he wanted to plead, "there was never any indication by this defendant that he wanted to plea[d]," and "every indication was that Mr. Ritacca went over all the ramifications of the plea with this defendant." It also stressed that neither defendant nor Daniel wanted him to do any jail time. In addressing Ritacca's apparent confusion, the court noted that, although "there were comments made by Mr. Ritacca that he didn't understand, *** he cleared that up in the remainder of the transcript as well as here in court." It concluded by stating that

> "just because now after that plea was rejected and [defendant] has now been found guilty of murder, [it] doesn't give him the right to go back now and say that Mr. Ritacca did anything unprofessional. There is nothing in the record to indicate that Mr. Ritacca was compromised or that his advice or information provided to this defendant was unprofessional."

¶ 65                                    D. Sentencing

¶ 66    On March 2, 2018, the court held a sentencing hearing. Highland Park police officer Darren Graff testified that on morning of August 1, 2012, he received a dispatch regarding suspicious individuals who had pillowcases and were walking in between houses. Defendant, Schenk, and a third individual were apprehended. Defendant was found carrying a backpack, inside of which was a large knife, an iPod, and two GPS units that he had stolen from parked vehicles. Defendant confessed that it was his idea for the group to burglarize vehicles.

¶ 67    Highwood police officer Ed Biondi testified that at approximately 2:23 a.m. on June 3, 2013 (some 13 to 14 hours before Nutter was murdered), he observed defendant, Schenk, and Coffee walking down the street. Coffee was wearing plastic gloves. Biondi asked Coffee why he

was wearing the gloves, and Coffee replied that it was cold outside. Biondi then asked the group where they were going, and Coffee answered that he was going to his house. Defendant and Schenk then separated and ran away. Biondi notified dispatch that two individuals were fleeing, but neither defendant nor Schenk were located by police that night. In the days that followed, Biondi fingerprinted and photographed defendant, Schenk, and Coffee in connection with Nutter's murder.

¶ 68     Kimberly Crittendon testified that she was a corrections officer with the Lake County Sheriff's Department. She testified that, up to the sentencing hearing, defendant had 68 violations in the jail, including 5 violations for fighting with other inmates. In January 2015, defendant fought with an inmate and did not stop until they were sprayed with pepper spray. In February 2016, defendant fought with an inmate, and all the inmates in the area scattered. In July 2016, defendant fought with an inmate because the other inmate refused to cover up his "King Killer" tattoo; Crittendon testified that she believed that defendant was a member of the Latin Kings. The other inmate had facial injuries and was "covered in blood." In September 2016, defendant was observed running to his cell from another cell and then washing blood from his hand. The inmate from whose cell defendant had run had a black eye, a bruised face, and a bloody hand. In October 2017, defendant was again observed fighting. Defendant had a black eye and tried to disguise the discoloration with toothpaste. In all these instances, defendant denied fighting. Some of defendant's other violations were minor offenses, such as laughing or talking too loudly.

¶ 69     Angie Nutter, Michael Nutter, and Nutter's sister provided testimony and statements regarding the devastating impact his death had on their lives.

¶ 70     Defendant presented evidence in mitigation. Laurie Cashman testified that she was a

mitigation specialist retained by defendant's family to prepare a mitigation report.[2] She conducted an "exhaustive number of interviews" with individuals familiar with defendant, and she provided detailed evidence regarding defendant's background and characteristics. She testified that defendant's relationship with his parents, Daniel and Rebeca Vatamaniuc, "involved a deep love" but also a sense of "longing" because of his limited contact with them. Starting at an early age, defendant was often home alone because Daniel worked long hours and Rebeca had moved out of state. Defendant believed that the family would move out of state to rejoin Rebeca, but that plan never materialized, and he was devastated. Defendant was also bullied at school starting when he was six years old, because of his weight and his accent. Defendant's older brother also bullied him "pretty severely." Defendant described instances where his brother held his head underwater until he thought he would drown, stuck his finger into an electrical outlet, and set fire to his hair. Cashman also detailed that two of defendant's friends had died. One was killed by a stray bullet, and the other friend, whom defendant thought of as an older brother, died by suicide after defendant missed several of his phone calls late one night. Defendant never received counseling or therapy, even though the school psychologist recommended that he be evaluated by a professional. Cashman believed that defendant was a "follower," stating that defendant "sought the feeling of family wherever he could and that whatever friends would accept him, he went with," including Schenk and Coffee. Cashman opined that defendant would not reoffend, because he was no longer self-medicating with alcohol and marijuana and was focused on a positive future for himself wherein he wished to enter a field helping others. She also noted defendant's participation in alcoholics anonymous, frequent meetings with the chaplain, receipt of his GED, and study of two

---

[2] The report is not included in the record on appeal.

foreign languages, "to better himself and to use his time wisely." She also relayed that defendant's former cellmate submitted to a chaplain an article for publication that detailed how defendant helped him with his own struggles and anger and noted that defendant checked out for his cellmate books that defendant thought would help him.

¶ 71    Daniel and Rebeca both testified that they believed defendant could be rehabilitated. Rebeca testified that she moved out of state when defendant was 11 years old. She brought defendant's older brother to live with her because he was having trouble with some of his friends, but she "left [defendant] behind" because Daniel was very attached to him. Shortly before the events of June 2013, defendant asked if he could live with her because he was having "some problems and [wanted] to get out of Highland Park." She testified that she "didn't know how deep he was in the problem" and told him "no."

¶ 72    Defendant made a statement in allocution. He began by speaking about the impact the offense had on himself, and he apologized to his family for "all the stress, tears, and sleepless nights that this caused" them. He next addressed Nutter's family and stated that he wished "to cause [them] no more grief" and for them to "know how truly and genuinely sorry [he was] for all that [they] have endured." He apologized for not having "the courage to do anything, something, that might have saved him." He asked for their forgiveness for that failure and for "being in any type of correlation, connection, relation, whatever—for even simply being there" when Nutter was killed. He ended by stating that he learned from others that Nutter was "a great person" and that it was "more than despicable" and "more than a shame" that "the light that [he] had in this world [was] unfortunately and tragically snuffed out."

¶ 73    During the sentencing hearing, a copy of the presentence investigation report (PSI) was admitted into evidence. In the portion of the PSI detailing the instant offense, defendant stated,

pertinently, as follows:

> "When we got to where my codefendant said we were meeting up [with] the guy, Colin Nutter pulled up. We got into his car. When he got in, my codefendant told him to pull off. Colin then pulled into a driveway and, as I was looking out the window, a loud gunshot went off. I turned to see Colin slump forward, and 'co-d' with the gun in his hand. I looked back at Colin and was stuck. After a while, I realized co-d was yelling something at me. He wanted me to help put Colin's body in the trunk. Looking at the gun in his hand and back at Colin, I feared I'd be shot, too. Everything happened so fast, and he didn't even ask for anything, didn't give Colin a chance, or nothing. He just shot him. I don't know what my state of mind was that day. I know I just wish I told the police or something. I didn't run because co-d knew where I, and my family lived."

The PSI noted that, when discussing his attitude regarding Nutter's death, defendant stated:

> "I wish I could have saved Colin or knew what co-d was plotting to prevent it somehow. I know I'm not a perfect person, and makes [*sic*] mistakes. Even still[,] I had no knowledge of what was to take place. I had no part in it other than what I did in fear of mine and my family's lives. For that alone I am responsible for. But for Colin's life? I will never claim responsibility for that, or for any cruel intentions that led to it."

The "conclusion/recommendations" portion of the PSI noted that defendant "is adamant he did not know what was going to occur the night *** Nutter died. He expressed what he did the night *** Nutter died was out of fear for himself and his family." It noted that, "[b]ased on the offense, the defendant is subject to a mandatory prison sentence" and stated that, "[w]hile in custody[,] [defendant] may wish to seek substance abuse / mental health / or any educational or vocational programing available."

¶ 74    The circuit court merged the first-degree murder convictions and sentenced defendant to 54 years in the Illinois Department of Corrections to be served at 100%, followed by an MSR term of 3 years. Defendant filed a motion to reconsider the sentence, which the court denied on May 17, 2018. Defendant timely appealed.

¶ 75                                    II. ANALYSIS

¶ 76    Defendant raises two issues on appeal. He argues that (1) he received ineffective assistance of counsel during plea negotiations because Ritacca failed to properly convey the details of the State's 25-year plea offer, including that the State would withdraw it if not accepted by a certain date, and (2) his 54-year sentence is a *de facto* life sentence and violates the eighth amendment prohibition against cruel and unusual punishment and the proportionate penalties clause. We address each issue in turn.

¶ 77                        A. Ineffective Assistance of Counsel

¶ 78    On appeal, defendant largely reiterates the ineffective-assistance-of-counsel claim that was rejected by the circuit court. Namely, he contends that he received ineffective assistance of counsel stemming from Ritacca's failure to properly convey to him the details of the State's written plea offer—including that the State would withdraw the offer if not accepted by October 21, 2013, and that the sentence could be served at 50% with good-time credit. Defendant asserts that, had he known those details, "there is a reasonable probability that *** he would have accepted the offer." Defendant prays that we vacate his conviction and, relying on *Lafler v. Cooper*, 566 U.S. 156 (2012), asserts that the appropriate remedy is to "remand for the specific performance of the original plea agreement."

¶ 79    The State responds that Ritacca properly conveyed the offer, that defendant failed to accept it, and that defendant would not have accepted it prior to its expiration or withdrawal. The State

stresses that defendant expressed interest in the offer only after (1) it had lapsed six months prior, (2) he had received unfavorable rulings on several motions, and (3) he was aware that further investigation led to Valentine's written statement that indicated that defendant was the shooter. The State maintains that defendant offered no independent support for his claim that he would have accepted the offer such that he did not establish prejudice for his claim of ineffective assistance of counsel to succeed.

¶ 80    A criminal defendant's right to effective assistance of counsel is provided by the sixth and fourteenth amendments to United States Constitution. *People v. Angarola*, 387 Ill. App. 3d 732, 735 (2009) (citing U.S. Const., amends. VI, XIV). The sixth amendment right to effective assistance of counsel applies to plea negotiations. *People v. Curry*, 178 Ill. 2d 509, 528 (1997) ("[a] criminal defendant has the constitutional right to be reasonably informed with respect to the direct consequences of accepting or rejecting a plea offer." (Emphasis omitted.)) "This right to effective assistance of counsel extends to the decision to reject a plea offer, even if the defendant subsequently receives a fair trial." *People v. Hale*, 2013 IL 113140, ¶ 16 (citing *Curry*, 178 Ill. 2d at 518).

¶ 81    Claims of ineffective assistance of counsel during plea bargaining are evaluated under the familiar standards set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted in Illinois by *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy two prongs, namely that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance resulted in prejudice. *People v. Manning*, 241 Ill. 2d 319, 326 (2011). However, we may dispose of a claim of ineffective assistance of counsel by addressing the prejudice prong without first addressing counsel's performance. *Albanese*, 104 Ill. 2d at 527. To

establish prejudice where a plea offer has lapsed or was rejected because of counsel's deficient performance, a defendant must demonstrate a reasonable probability that, absent his attorney's deficient advice, he would have accepted the plea offer. *Hale*, 2013 IL 113140, ¶ 18. Such demonstration must include more than a defendant's own subjective, self-serving assertions. *Id.* Instead, there must be " 'independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice,' and not on other considerations." *Id.* (quoting *Curry*, 178 Ill. 2d at 532). Additionally, a defendant must demonstrate a reasonable probability that the plea would have been entered without the prosecution withdrawing it or the trial court refusing to accept it. *Id.* ¶¶ 19-20. "The disparity between the sentence a defendant faced and a significantly shorter plea offer can be considered supportive of a defendant's claim of prejudice." *Id.* ¶ 18. The question of whether an individual's constitutional rights have been violated is reviewed *de novo*. *Id.* ¶ 15.

¶ 82    Here, we conclude that defendant has failed to establish prejudice under *Strickland* because he failed to identify anything in the record that predates the expiration of the offer on October 21, 2013, and corroborates his naked assertion that he would have timely accepted the State's offer but for his counsel's deficient performance. As noted, a defendant's own subjective and self-serving assertion that he or she would have accepted the plea offer without his or her attorney's deficient advice is insufficient to establish prejudice, absent " 'independent, objective confirmation that [his or her] rejection of the proffered plea was based upon counsel's erroneous advice.' " See *id.* ¶ 18 (quoting *Curry*, 178 Ill. 2d at 532). Indeed, defendant seems to concede in his reply brief the absence of any evidence to substantiate his assertion. In directly responding to the State's argument, rather than identifying anything to independently and objectively confirm that he would have timely accepted the plea offer, defendant states only that "a reasonable person would have

- 32 -

accepted [it] if conveyed properly, where it amounted to a sentence of only approximately 12 and a half years."

¶ 83    However, we note that Ritacca testified that he shared the offer with defendant and Daniel following the Rule 402 conference that was held on September 13, 2013, and he explained the offer in detail to them both—pertinently, that "the murder [charges were] going to be dismissed, that [defendant] was going to plead guilty to an armed robbery and *** concealment of a [homicidal death]," and that, "[i]n total, the bottom line of that was about [a] 12 year[ ] sentence." In denying defendant's motion for a new trial, the circuit court necessarily deemed this testimony credible, as it commented that there was "every indication *** that Mr. Ritacca went over all the ramifications of the plea" with defendant. Defendant's testimony also establishes that Ritacca communicated the offer to him, albeit "briefly," and that he saw the written offer while he was seated at counsel's table "one day in court when [he] believe[d] that [Ritacca was] filing a motion." Moreover, the record confirms that Ritacca communicated the offer to defendant when he met with him in jail following the Rule 402 conference on September 13, 2013—which was more than a month before the offer ultimately expired. Notably, on September 16, 2013, Ritacca informed the court that he discussed the offer with defendant, and defendant acknowledged on the record that Ritacca discussed it with him. The record also confirms that defendant was present in court on September 27 and October 1, 2013—when the prosecutor announced both that a "formal deadline for the offer that's already been tendered" would be provided on October 1, 2013, as well as that the State would "keep that written offer that we did tender open until October 21st. After that, the offer will be withdrawn." Finally, we observe that defendant did not aver in the affidavit attached to the motion to vacate the judgment or, in the alternative, for a new trial, that he would have

accepted the offer on or before October 21, 2013, had Ritacca counseled him that the State would withdraw it on that date.

¶ 84    To support his assertion that he would have accepted the plea offer, defendant points only to his motion to enforce the plea agreement, reasoning that, if he "did not want to plead guilty, then Ritacca would not have filed a motion to enforce the plea agreement." We note that this motion, which was not filed until May 8, 2014, is the first indication in the record that defendant wished to accept the State's offer. However, the motion, having been filed more than six months after the offer expired, does no more to corroborate defendant's assertion that he would have timely accepted the offer absent Ritacca's deficient performance than does the instant appeal. Defendant makes no argument that the motion establishes independent, objective confirmation that the plea lapsed due to Ritacca's erroneous advice. We also note that the parties made more than 15 interim court appearances between the expiration of the offer on October 21, 2013, and the filing of defendant's motion to enforce the plea agreement on May 8, 2014. By that time, however, defendant was aware that further investigation had yielded Valentine's written statement that defendant told him that "he had put the gun to Colin's head and pulled the trigger," which, according to the express terms of the plea offer, very likely would have caused the offer to be withdrawn.

¶ 85    If anything, the record affirmatively rebuts defendant's assertion that he would have accepted the State's offer prior to its expiration. On August 28, 2013, the State informed the court that it was "considering something along the lines of an armed robbery based on the dangerous weapon with consecutive concealing of a homicidal death." Upon hearing this, Ritacca confirmed the prosecutor's statement that defendant "would not take anything in the teens" and that Daniel did not want him to do any jail time. Ritacca also added that he had "not heard anything agreeable

for this defendant." Although these assertions predate the written offer, we note that the offer the State was "considering" largely mirrors the written offer that it eventually extended to defendant. Nevertheless, what the State was "considering" was "not agreeable for this defendant." These statements demonstrate a probability that defendant would have not accepted the offer even if he were aware that it would be withdrawn by a date certain. Further, despite having received the offer, defendant filed a motion to dismiss the armed-robbery charges and the concealment-of-a-homicidal-death charge on October 1, 2013, which demonstrated a lack of interest in pleading to those charges. We also note that, although defendant stresses Ritacca's statements on the record that he wished to resolve the case without a trial, the various pretrial reports of proceedings are also replete with statements that he was ready to proceed with trial.

¶ 86    Put simply, in the absence of "independent, objective" confirmation demonstrating a reasonable probability that defendant would have accepted the State's offer prior to its expiration on October 21, 2013, defendant has failed to make a showing of prejudice under *Strickland*, and we need not examine the additional factors necessary to demonstrate prejudice. See *id*. ¶ 30. The circuit court properly rejected the ineffective-assistance-of-counsel claim that defendant included in his motion to vacate the judgment or, in the alternative, for a new trial. We therefore affirm his conviction and deny his request to remand for specific performance of the plea offer.

¶ 87                              B. The Eighth Amendment

¶ 88    Defendant next argues that his 54-year sentence is a *de facto* life sentence, which violates the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). He relies on *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, as interpreted by our supreme court in *People v. Holman*, 2017 IL 120655, and *People v. Buffer*, 2019 IL 122327, to argue that the

circuit court did not consider his youth and its attendant characteristics in imposing his sentence or evaluate whether he was irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond the possibility of rehabilitation. As a related matter, defendant also asserts that the record suggests that the circuit court did not realize that the 15-year firearm enhancement was not mandatory but instead was within its discretion under section 5-4.5-105(b) and (c) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-105(b), (c) (West 2018)). Defendant requests that we vacate his sentence and remand for a new sentencing hearing.

¶ 89    In response, the State concedes that defendant's 54-year sentence is a *de facto* life sentence under *Buffer*, but it disagrees with defendant's assertion that the sentence violates the eighth amendment or the proportionate penalties clause. In the State's view, the record demonstrates that the circuit court properly considered all of the relevant sentencing factors, including defendant's youth and its attendant circumstances, as well as his "rehabilitat[ive] potential or lack thereof." It argues that a new sentencing hearing is unnecessary because "defendant is one of the rare juveniles whose irreparable corruption warrants *** a [*de facto* life] sentence." Regarding the enhancement, it stresses that defendant's 54-year sentence is within the 20- to 60-year range for first-degree murder without the firearm enhancement.

¶ 90    We address only defendant's first claimed sentencing error, which we find dispositive.

¶ 91    At this juncture, an overview of the principles applicable to offenders who are juveniles at the time of their offense is appropriate. The eighth amendment to the United States Constitution prohibits, *inter alia*, "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states via the fourteenth amendment. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). Proportionality is inherent in that prohibition, and a criminal sentence should be " 'graduated and proportioned to both the offender and the offense.' " *Holman*, 2017 IL 120655, ¶ 33 (quoting

*People v. Davis*, 2014 IL 115595, ¶ 18). Reviewing courts look to " ' "the evolving standards of decency that mark the progress of a maturing society," ' " rather than to the standards of bygone times, in evaluating whether a sentence is so excessive that it is cruel and unusual under the eighth amendment. See *Miller*, 567 U.S. at 469; *Buffer*, 2019 IL 122327, ¶ 15.

¶ 92    Our supreme court has recognized that "there is a genuine risk of disproportionate punishment" where, as is the case here, the defendant is a juvenile and the offense is serious. See *Holman*, 2017 IL 120655, ¶ 33. "[T]he United States Supreme Court addressed that risk and unmistakably instructed that youth matters in sentencing." *Id.* This principle emerged from United States Supreme Court cases such as *Roper*, 543 U.S. 551 (eighth amendment prohibits capital sentences for juveniles, including those who commit murder), *Graham v. Florida*, 560 U.S. 48 (2010) (eighth amendment prohibits mandatory life sentences for juveniles who commit nonhomicide offenses), and *Miller*, 567 U.S. 460 (eighth amendment prohibits mandatory life sentences for juveniles, including those who commit murder).

¶ 93    The Court has cautioned that the "imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Miller*, 567 U.S. at 474. As the Court has noted, "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471. The *Miller* Court outlined several such differences. Specifically, children (1) lack maturity and have an underdeveloped sense of responsibility, which leads to "recklessness, impulsivity, and heedless risk-taking"; (2) are more vulnerable to negative influences and outside pressures from their families and peers as well as have limited control over their environments and lack the ability to extricate themselves from crime-producing settings; and (3) have characters that are not as " 'well formed' " and traits that are " 'less fixed' " as compared to adults, such that their actions are not as likely to be evidence of irretrievable depravity. The Court noted that "the distinctive

attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472. Put simply, juveniles " 'are less deserving of the most severe punishments' " because they have diminished culpability and greater prospects for reform. *Id.* at 471 (quoting *Graham*, 560 U.S. at 68). The Court also pointed to studies demonstrating the fundamental differences between the minds of juveniles and adults, and it noted that "transient rashness, proclivity for risk, and inability to assess consequences" reduced the moral culpability of juveniles and "enhanced the prospect that, as the years go by and neurological development occurs," their deficiencies would be reformed. *Id.* at 471-72.

¶ 94      Our supreme court recently observed that

"[t]he mandatory penalty schemes in *Miller* prevented 'the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—[those] laws prohibit[ed] a sentencing authority from assessing whether the law's harshest term of imprisonment proportionally punishes a juvenile offender.' " *Buffer*, 2019 IL 122327, ¶ 18 (quoting *Miller*, 567 U.S. at 474).

In a passage quoted verbatim by our supreme court in several instances, the *Miller* Court noted the fatal defects in a sentencing scheme that mandates life without parole for juvenile offenders:

" 'To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way

familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.' " *People v. Lusby*, 2020 IL 124046, ¶ 70 (Neville, J., dissenting) (quoting *Miller*, 567 U.S. at 477-78).

See *Buffer*, 2019 IL 122327, ¶ 19 (same); *Holman*, 2017 IL 120655, ¶ 37 (same).

¶ 95    The *Miller* Court stopped short of outright prohibiting a sentence of life without parole for juveniles who commit murder but instead mandated that the trial court first examine "an offender's age and the wealth of characteristics and circumstances attendant to it" before imposing such a sentence. *Miller*, 567 U.S. at 476. The *Miller* Court stressed that its decision "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics"—before it may impose such a sentence. *Id.* at 483. The Court also made clear its view that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon" due to the great difficulty "of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " *Id.* at 479-80 (quoting *Roper*, 543 U.S. at 573, and *Graham*, 560 U.S. at 68). The Court continued that, "[a]lthough we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

¶ 96    In *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), the Court held that *Miller* applied retroactively, and it clarified that *Miller* established both a substantive and a procedural requirement. The *Montgomery* Court elaborated that, although *Miller* did not bar life without parole for *all* juveniles, it nevertheless "did bar life without parole *** for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at ___, 136 S. Ct. at 734. In other words, "the sentence of life without parole is disproportionate for the vast majority of juvenile offenders." *Id.* at ___, 136 S. Ct. at 736. Further delving into *Miller*, the *Montgomery* Court explained that *Miller*

> "recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of 'children's diminished culpability and heightened capacity for change,' *Miller* made clear that 'appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' " *Id.* at ___, 136 S. Ct. at 733-34 (quoting *Miller*, 567 U.S. at 479).

¶ 97    Our supreme court tied these various constitutional principles neatly together in *Holman*, wherein it specified which characteristics attend youth and explained the relationship between these characteristics and the concept of incorrigibility. The *Holman* court, in explaining how to apply *Miller* to juvenile sentences, clarified as follows:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics

include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 98    Moreover, *Holman* stated that consideration of "the *Miller* factors" is consistent with section 5-4.5-105 of the Unified Code, which provides a framework for sentencing defendants who were under 18 years of age at the time of their offense. *Id.* ¶ 45. The statute requires sentencing courts to consider several "additional factors in mitigation in determining the appropriate sentence" for any defendants who were younger than 18 at the time of their offense. 730 ILCS 5/5-4.5-105(a) (West 2018). These statutory factors are "taken from the Supreme Court's list." *Holman*, 2017 IL 120655, ¶ 45. They include the following:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel[,] chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2018).

We also note that subsections (b) and (c) provide that, in the court's discretion, it may decline to impose any otherwise applicable sentencing enhancement based upon the possession of a firearm that proximately causes to another person great bodily harm, permanent disability, permanent disfigurement, or death. *Id.* § 5-4.5-105(b), (c); *Buffer*, 2019 IL 122327, ¶ 36.

¶ 99     In *Buffer*, our supreme court observed that *Miller*, as interpreted and clarified in *Montgomery*, " 'drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption.' " *Buffer*, 2019 IL 122327, ¶ 24. It went on to declare that, "[e]ven if a court considers a child's age prior to sentencing the child to life in prison without parole, that sentence still violates the eighth amendment for a juvenile whose crime reflects unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Id.* Similarly, it reiterated *Miller*'s statement "that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." (Internal quotation marks omitted.) *Id. Buffer* recognized that *Miller* "rendered life without parole an unconstitutional penalty for that category of juvenile offenders whose crimes reflect the transient immaturity of

youth." *Id.* "*Miller*'s procedural component requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." (Internal quotation marks omitted.) *Id.* "Such a hearing 'is necessary to separate those juveniles who may be sentenced to life without parole from those who may not.' " *Id.* (quoting *Montgomery*, 577 U.S. at ____, 136 S. Ct. at 735).

¶ 100   Noting that "*Miller* contains language that is significantly broader than its core holding" (*Holman*, 2017 IL 120655, ¶ 38), our supreme court has extended *Miller* to apply to various other sentencing scenarios, including (1) mandatory term-of-years sentences that are the functional equivalent of life without the possibility of parole—also known as a *de facto* life sentence (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10 (*per curiam*))—and (2) discretionary sentences of life without the possibility of parole for juveniles (*Holman*, 2017 IL 120655, ¶ 40). Applicable here, in *Buffer*, our supreme court held that a *de facto* life sentence for a juvenile offender is one that exceeds 40 years, reasoning that a prison sentence of 40 years or less for a juvenile offender still provides "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (Internal quotation marks omitted.) *Buffer*, 2019 IL 122327, ¶¶ 40-41 (quoting *Miller*, 567 U.S. at 479).

¶ 101   We now turn to the merits. Upon careful review of the transcript of the sentencing hearing, we agree with defendant that his *de facto* life sentence does not comport with *Miller* and its progeny, because the circuit court failed to evaluate whether he is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond the possibility of rehabilitation. As noted, *Miller* requires sentencing courts to " 'separate those juveniles who may be sentenced to life without parole from those who may not.' " *Id*. ¶ 24. Sentencing courts are instructed to accomplish this task by deciding on which side of the "line" the juveniles fall and categorize them as either

children whose crimes reflect "unfortunate yet transient immaturity" or "those rare children whose crimes reflect irreparable corruption." (Internal quotation marks omitted.) *Id.*

> "Only after consideration of youth and its attendant circumstances, as in the *Miller* factors or those in section 5-4.5-105, *and* a finding of 'irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation' [citation][,] will the eighth amendment's bar against cruel and unusual punishment yield to a *de facto* life sentence without possibility of parole for a juvenile." (Emphasis in original.) *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 47 (quoting *Holman*, 2017 IL 120655, ¶ 46).[3]

¶ 102   Here, at the conclusion of defendant's sentencing hearing, the circuit court announced that it considered several factors, including the underlying facts of the case, the PSI, the aggravating and mitigating factors, Cashman's mitigation report submitted on defendant's behalf, the sentencing testimony, and the arguments of counsel. The court recognized that, because defendant was 17 years old at the time of the offense, it was required it to consider defendant's "age, [his] particular maturity, whether or not [he was] able to appreciate the risks and consequences, [his] family and home environment, [his] degree of participation, [and his] ability and capacity to assist

---

[3] We note that on March 9, 2020, the United States Supreme Court granted a writ of *certiorari* in *Jones v. Mississippi*, 589 U.S. ___, 140 S. Ct. 1293 (2020), wherein the issue presented is whether the eighth amendment requires the sentencing authority to make an explicit finding that a juvenile is permanently incorrigible before imposing a sentence of life without parole. The Court heard oral argument on the matter on November 3, 2020. The Court's decision has not been issued as of the filing of the instant case.

[his] attorney." The court related that it had "to consider all of this, looking at the core of the sentencing statute, which is rehabilitation." The court stated that it "consider[ed] all this information" but cautioned that it might "only comment on a few things."

¶ 103    In announcing the mitigating factors, the circuit court noted that, while in jail, defendant had earned a GED, was involved in Bible study, was writing poetry, had attended self-help meetings, and was learning new languages. It also referenced defendant's deep feelings of abandonment and loneliness, his low self-esteem, his lack of a "real prior criminal record," and his lack of intellectual or physical disabilities. It also stated that it considered his statement at sentencing concerning his remorse and his appeal for forgiveness from Nutter's family.

¶ 104    In turning to the aggravating factors, the court stated that it could not "find that there was any provocation or that [the murder] was committed because [defendant] hung around with the wrong crowd or that it was because [defendant] was lonely and abandoned or *** depressed or bullied." The court then recounted the evidence, stating:

> "On June 3rd of 2013, you, Michael Coffee, and Ben Schenk were together. You were at *** Hahn's house. This gun was passed around between all three of you. It was taken apart, bullets were taken out, put back in, and the decision was made with all three of you that you wanted drugs and you wanted to rob a drug dealer. And so Colin Nutter was called *** [and] told to meet in a secluded area in Highland Park. He was lured there by the three of you under the guise of buying drugs. He parked his car. The three of you walked there and got in his car. Unbeknownst to him, the three of you having a gun. You knew the gun was in the car. You knew what they were going to do, all three of you. Because it was like nothing. You got in the back seat, Coffee was in the front seat, and Schenk was sitting next to you. And then Colin was shot in the back of the head. You acted

together. You agreed to the murder. You acted in furtherance of it. You aided [and] abetted, *** dragging his body out of his own car and stuffing it in his trunk. And then from there, *** you drive around with his body in the trunk of his own car. And then, like some piece of garbage, you throw his body on the side of the road. You cover him with leaves and branches, and you drive away, but you forget something. You want his wallet and whatever else he had, and so then you drive back, pick [the] pockets of this dead young man like nothing happened, and then drive to Chicago. You went home, you ate, you slept, you went to school the next day, like nothing happened. You met with friends, your girlfriend, like nothing happened. You smoked pot, like nothing happened.

I do consider the impact that this has had on the Nutter family. They lost their only son over some pot. And no sentence will ever assuage their *** grief or bring him back. But this sentence must deter others from thinking 'it is no big deal.' That you can murder *** someone and act like nothing happened."

¶ 105   Here, although the court provided a cursory mention of the *Miller* factors, it provided little explanation as to how it applied them to defendant's particular circumstances. Instead, the court stated that it "consider[ed] all of this information," even though it would "only comment on a few things." In seemingly discounting defendant's youth, the court declared only that it could not "find that there was any provocation or that [the murder] was committed because [defendant] hung around with the wrong crowd or that it was because [defendant] was lonely and abandoned or *** depressed or bullied." It then recounted the evidence presented at trial and repeatedly emphasized defendant's actions in the days following the offense, wherein he acted "like nothing happened" and continued his daily routine as a high school student.

¶ 106   Even if the circuit court's statements reflected adequate consideration of the *Miller* factors, they lack any indication, either express or implied, that the court evaluated whether defendant was among "the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility." See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. This omission is grievous because, even if a court considers a child's age prior to sentencing him or her to life in prison without parole, the sentence nevertheless violates the eighth amendment for a juvenile whose crime reflects unfortunate yet transient immaturity. *Buffer*, 2019 IL 122327, ¶ 24. As *Holman* made clear, "a juvenile defendant may be sentenced to life imprisonment without parole, *but only* if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption ***. The court may make that decision *only after* considering the defendant's youth and its attendant characteristics." (Emphases added.) *Holman*, 2017 IL 120655, ¶ 46.

¶ 107   There is also no indication that the circuit court specifically considered the recommendation included in the PSI that defendant "seek substance abuse/mental health/or any educational or vocational programing available." These recommendations, at a minimum, suggest that defendant would derive some benefit from these services. Moreover, the court did not acknowledge Cashman's ultimate opinion that defendant would not reoffend because he had ceased self-medicating with drugs and alcohol. Her ultimate opinion, if accepted by the court, would heavily weigh against the imposition of a life sentence—and very likely would be dispositive of the issue.

¶ 108   The State argues that "the record *** demonstrate[s] that the sentencing court considered *** [defendant's] lack of rehabilitative potential," pointing to the court's statement that it also "look[ed] at the core of the sentencing statute, which is rehabilitation." However, the State reads this lone statement far too broadly, and it cannot reasonably be said that it confirms that the court

believed that, in defendant, it had "encounter[ed] the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." Nor can it be interpreted to confirm that the court believed that defendant's sentencing was the " 'uncommon' " occasion where the harshest possible penalty for a juvenile was appropriate. See *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733-34.

¶ 109    Put simply, the circuit court did not address defendant's potential for future criminality or find that he could not be rehabilitated or indicate that the *de facto* life sentence was chosen because defendant was beyond the possibility of rehabilitation. Instead, in issuing the 54-year sentence, the court emphasized the need to "deter others from thinking 'it is no big deal' [to] murder *** someone, and act like nothing happened." However, as the United States Supreme Court has observed, "penological justifications *** apply to [juveniles] with lesser force than to adults," due to their diminished culpability. *Roper*, 543 U.S. at 571. Indeed, juveniles are less susceptible to deterrence because the same characteristics that render them less culpable than adults, such as lack of maturity and an underdeveloped sense of responsibility, often lead to ill-considered actions and decisions. *Graham*, 560 U.S. at 72.

¶ 110    Because the record does not reflect a determination by the circuit court that defendant was among the "rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility" (see *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734) such that he was beyond the possibility of rehabilitation, nor does it reasonably suggest that the court considered defendant's potential for rehabilitation or lack thereof, we vacate his sentence and remand for a new sentencing hearing. On remand, the court is advised to make a more thorough record of how it weighs each of the relevant factors in evaluating defendant's youth and its attendant circumstances as well as explicitly evaluate and determine whether defendant's crime reflected "unfortunate yet transient immaturity"

or "irreparable corruption." (Internal quotation marks omitted.) See *Buffer*, 2019 IL 122327, ¶ 24; see also *Davis*, 2014 IL 115595, ¶ 43 (noting appropriate remedy is to vacate sentence and remand for a new sentencing hearing).

¶ 111   We express no opinion as to what sentence defendant should receive on remand. We emphasize, however, that, under *Holman*, a juvenile may not be sentenced to life imprisonment without parole unless the circuit court (1) considers the defendant's youth and its attendant circumstances and (2) determines that the defendant is among the rarest of children whose conduct demonstrates irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. See *Holman*, 2017 IL 120655, ¶ 46.

¶ 112   Because of our resolution, we need not evaluate defendant's alternative argument that his sentence violates the proportionate penalties clause of the Illinois Constitution.

¶ 113   Likewise, we need not substantively address defendant's argument that the circuit court was unaware that the 15-year firearm enhancement was discretionary under section 5-4.5-105(b) and (c) of the Unified Code. We will, however, comment on it briefly because this issue is likely to recur on remand. The record reflects that, in finding that there was insufficient evidence to conclude beyond a reasonable doubt that defendant was the shooter, but also finding that defendant, or one whose conduct he was responsible for, was armed with a firearm, the court stated that "the penalties for said offense [are] an additional 15 years of imprisonment." At the sentencing hearing, defense counsel stated that the sentencing range was 35 to 75 years. This statement presumed that the 15-year enhancement was inevitable. On appeal, defendant asserts that the sentencing range should have been 20 to 75 years—the latter 15 years of that range being applicable if the court, in its discretion, chose to impose a firearm enhancement. The State concedes that the enhancement is discretionary and that the sentencing range is 20 to 60 years

without it. On remand, the court should be mindful that the imposition of a firearm enhancement under section 5-4.5-105 of the Unified Code is not mandatory but, rather, is within its discretion. 730 ILCS 5/5-4.5-105(b), (c) (West 2018); *Buffer*, 2019 IL 122327, ¶ 36.

¶ 114                                    III. CONCLUSION

¶ 115   For the reasons stated, we affirm defendant's conviction, vacate his sentence, and remand for resentencing.

¶ 116   Affirmed in part and vacated in part.

¶ 117   Cause remanded.

---

**No. 2-18-0379**

---

| | |
|---|---|
| **Cite as:** | *People v. Vatamaniuc*, 2021 IL App (2d) 180379 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 13-CF-1611; the Hon. Victoria A. Rosetti, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Jessica Wynne Arizo, of State Appellate Defender's Office, of Elgin, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---