2023 IL App (2d) 210665-U
No. 2-21-0665
Order filed March 31, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-1611 |
| PHILIP VATAMANIUC, | ) ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**ORDER**

¶ 1   *Held*: Defendant's 54-year sentence for first-degree murder is affirmed, where: (1) the sentence on remand was not more severe than the original sentence; and (2) the trial court properly considered defendant's youth and attendant characteristics.

¶ 2   This case comes before us following a remand for resentencing. After a bench trial, defendant, Philip Vatamaniuc, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 54 years' imprisonment. He was 17 years old at the time of the offense. We affirmed defendant's conviction on direct appeal but vacated his sentence to allow the trial court to conduct a sentencing hearing in compliance with *Miller v. Alabama*, 567 U.S. 460 (2012)

and its progeny. See *People v. Vatamaniuc*, 2021 IL App (2d) 180379, ¶¶ 101, 110 (*Vatamaniuc I*). We also advised the court to be mindful on remand that the imposition of sentencing enhancements based on the possession or discharge of a firearm was discretionary because defendant was under the age of 18 at the time of the offense. *Id.* ¶ 113. See 730 ILCS 5/5-4.5-105(b) (West 2018). On remand, the trial court conducted a new sentencing hearing. At the conclusion of the hearing, the court stated that it would decline to impose the enhancement, but it expressly found that defendant was "the rare individual who is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond rehabilitation" and again sentenced defendant to 54 years' imprisonment.

¶ 3 Defendant appeals, arguing that (1) the reimposition of a 54-year sentence violates the statutory prohibition on increasing sentences on remand except for conduct occurring after the original sentencing hearing; and (2) the trial court abused its discretion in sentencing him to a *de facto* life sentence because, in defendant's view, the court misconstrued several of the sentencing factors and conducted an improper analysis. We affirm.

¶ 4                              I. BACKGROUND

¶ 5                          A. Original Trial Proceedings

¶ 6 The facts were exhaustively recounted by this court in *Vatamaniuc I*. We briefly summarize the facts to give context to the instant appeal. The evidence at trial demonstrated that on the afternoon of June 3, 2013, defendant, age 17, and codefendants Michael Coffee and Benjamin Schenk, ages 17 and 20, respectively, were together in Highland Park at Lauren Hahn's house, who was then age 47. Defendant, Coffee, and Schenk passed a firearm back and forth between them. Coffee initiated a conversation regarding who they could rob to obtain drugs and money, and Colin Nutter's name came up. Coffee called Nutter, age 20, and arranged to meet him

under the guise of a meeting to purchase marijuana from him. The trio then left Hahn's house to meet Nutter. Hahn testified that defendant possessed the gun when they left, whereas Schenk testified that Coffee possessed it at that point.

¶ 7    As they walked to meet Nutter, Coffee stated that they needed Nutter's car because he wanted to go to the west side of Chicago. Schenk told Coffee that Nutter was not going to give them his car, so Coffee stated that they were "going to have to kill him." Coffee told defendant that it was his turn to "prove[] himself," and he gave defendant the gun. Defendant and Coffee then began "bandying Four Corner Hustler [(gang)] slogans back and forth and 'fist bumped.' "

¶ 8    When the trio arrived at the meeting spot, they put on gloves and waited for Nutter. Nutter arrived in his Dodge Stratus shortly later, and they got into the vehicle. Coffee sat in the front passenger seat, Schenk sat in the back seat, behind Coffee, and defendant sat behind Nutter. Schenk testified that Coffee turned the volume up on the radio and yelled "do it," at which point defendant shot Nutter in the back of the head.

¶ 9    Defendant did not testify, but he told investigators that he did not see the gun before they got into the car, and it surprised him when Schenk shot Nutter.

¶ 10    Defendant and Schenk then put Nutter's body into the trunk of the Dodge. Coffee drove the trio back to Hahn's house, where Schenk and Coffee cleaned the inside of the vehicle with bleach. The trio also smoked marijuana that they had taken from Nutter. After spending several hours at Hahn's house, Coffee drove the group in the Dodge to Schenk's residence, where they picked up towels, gardening gloves, and a shovel. They then headed toward the west side of Chicago. Schenk testified that they "began to get nervous about driving around with a body in the trunk." Coffee found a secluded spot and pulled over, and defendant and Schenk placed Nutter's body in some brush and covered it with leaves and sticks. They drove away only to return

approximately one hour later to take Nutter's wallet. Coffee took cash from the wallet and Schenk threw the cards that were in Nutter's wallet out of the car window as they drove on the expressway. They went to Chicago where, according to Schenk, he and defendant purchased and snorted cocaine. The group then drove back to Highland Park and parted ways.

¶ 11    Early the next day, Schenk and Coffee burglarized the home where Nutter lived with his parents. They took marijuana from Nutter's bedroom, prescription medication for Nutter's dog from the kitchen counter, and a Ford Focus from the garage. Defendant met up with Shenk and Coffee later that day, and the trio drove back to Chicago. Schenk drove the Dodge while defendant and Coffee drove the Ford. The Ford stopped suddenly at one point, and Schenk rear ended it with the Dodge. They left the Dodge parked on the street, and Schenk entered the Ford. They continued to drive around the west side of Chicago before returning to Hahn's house. Police located the Dodge on a street in Chicago, the Ford in Hahn's driveway, and the murder weapon in Schenk's backyard. Defendant, Schenk, and Coffee were all arrested within a matter of days in connection with the murder.

¶ 12    Following a bench trial, the court found defendant guilty of four counts of first-degree murder. The court stated that it could not find beyond a reasonable doubt that defendant "was the actual shooter," but it found that the State had proven that, during the commission of the offense, defendant or one whose conduct he was legally responsible for was armed with a firearm, and that "the penalties for said offense [are] an additional 15 years of imprisonment." After a sentencing hearing, the court merged the first-degree murder convictions and sentenced defendant to 54 years' imprisonment to be served at 100%, followed by a 3-year term of mandatory supervised release.

¶ 13                                B. Direct Appeal

¶ 14    We affirmed defendant's conviction on direct appeal but vacated his sentence and

remanded for a new sentencing hearing because the court had imposed a *de facto* life sentence, but the record bore no indication that the court evaluated whether defendant was among the rarest of juvenile offenders whose crimes reflect permanent incorrigibility such that he was beyond the possibility of rehabilitation. *Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 101. We also noted that, in announcing defendant's sentence, the court provided only a "cursory mention of the *Miller* factors" and little explanation as to how those factors applied to defendant. *Id.* ¶ 105. We advised the trial court, on remand, to "make a more thorough record of how it weighs each of the relevant factors in evaluating defendant's youth and its attendant circumstances as well as to explicitly evaluate and determine whether defendant's crime reflected unfortunate yet transient immaturity or irreparable corruption." (Internal quotation marks omitted.) *Id.* ¶ 110.

¶ 15    Defendant, on direct appeal, had also asserted that the trial court was unaware that the imposition of the 15-year firearm enhancement was discretionary under section 5-4.5-105(b) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2018)), and he argued that the sentencing range "should have been 20 to 75 years—the latter 15 years of that range being applicable if the court, in its discretion, chose to impose a firearm enhancement." *Id.* ¶ 113. The State conceded that the imposition of the firearm enhancement is discretionary and that the sentencing range for first-degree murder is 20 to 60 years without it. *Id.* Because of our holding, however, it was unnecessary to substantively address defendant's argument. Nevertheless, we recognized that the issue was likely to arise on remand, and we advised the court to be mindful on remand that the imposition of a firearm enhancement is discretionary due to defendant's juvenile status at the time of the offense under section 5-4.5-105(b) of the Code.

¶ 16                             C. Resentencing Hearing

¶ 17    On September 27, 2021, the trial court held a new sentencing hearing. It took judicial

notice of the testimony at the original sentencing hearing, including that of officers Graff, Biondi, and Crittendon, as well as the victim impact statements from Nutter's parents and sister. The State also presented updated victim impact statements from them.

¶ 18    In mitigation, and without objection, the court took judicial notice of the mitigation report prepared by Laurie Cashman that was presented at the original sentencing hearing.[1]    Daniel Vatamaniuc, defendant's father, testified at the resentencing hearing. He testified that, at one time, defendant was part of a family of five living under one roof in Highland Park. Defendant's mother eventually moved to Arizona, and the family planned to reunite there, but that never happened. Defendant was "a happy kid" before his mother moved away, but after she relocated, defendant "did change." Daniel testified that he often worked 13 to 14 hours per day, during which defendant was left at home with his brother, who was two years older than defendant. Daniel would sometimes drop off fast food for his sons to eat for dinner before returning to work. He would often come home from work so late that defendant was already asleep. Daniel did not know what defendant and his brother did at home while he was working. He was unaware that defendant was bullied by his older brother, and he did not know that defendant's brother had set defendant's hair on fire or that he had submerged defendant's head underwater until defendant thought he would drown. Daniel acknowledged that a school psychologist recommended that defendant receive counseling and mental health treatment, but he did not act on the recommendation because he incorrectly believed that the school would provide those services. Daniel further testified that, because of his long hours, he "was not home to be a *** real good father," but he did the best that he could.

_____

[1]The mitigation report is absent from the record on appeal.

¶ 19   Defendant made a statement in allocution. He addressed Nutter's family and stated that he was "sorry for [their] loss" and that he hoped they would find peace. He also stated that he understood the importance of deterrence and wanted everyone to know that he was "not an irredeemable monster."

¶ 20   The State argued that the trial court appropriately considered defendant's youth and its attendant circumstances in fashioning defendant's original sentence. It contended that the purpose of the re-sentencing hearing was to provide the court with an opportunity for it to "rearticulate the reasons for why this sentence is appropriate." The State argued that the reimposition of a 54-year sentence was warranted because defendant's conduct demonstrated irreparable depravity, permanent incorrigibility, or irreparable corruption, and it outlined each of the *Miller* factors and argued that the court should find none of them to be mitigating. Addressing the factors, the State emphasized that defendant was just 6 months shy of his 18th birthday at the time of the offense, and that he planned and concealed the murder, which were not impetuous acts. It continued that there was "nothing remarkable" about defendant's family and home environment, and there was nothing in defendant's background to explain why "a horrific crime was about to occur or could have occurred." Concerning his degree of participation in the offense, the State argued that defendant was not an innocent bystander, but actively participated in Nutter's murder.

¶ 21   The State referred to the mitigation report prepared by Cashman and her opinion that defendant would not reoffend as "bunk," noting that Cashman prepared the report without first reading the transcript of defendant's murder trial or the police reports, and she failed to view the recording of defendant's police interview. The State also minimized Cashman's reliance on defendant's "sincere[]" interest in 'how she was doing' " as part of the basis for her ultimate opinion, arguing that he interacts with others in a "manner that is [most] beneficial to him." The

State continued that defendant could not be rehabilitated, citing a number of reasons, including defendant's failure to express remorse or take responsibility for his actions, and the increasing severity of his crimes and interactions with law enforcement. It emphasized while defendant awaited trial, he was unable to follow the rules of the jail because he received 68 infractions, including multiple infractions for physically fighting with other inmates. The State acknowledged that defendant had received a G.E.D. and attended language classes while he was in jail awaiting trial, but it argued that these acts did not show that defendant had rehabilitative potential, but rather, defendant was "finding his best way to fill his time." Finally, the State emphasized the heinous circumstances of the offense, and it asked rhetorically how an individual could be rehabilitated who "shows a complete indifference to another human being such that he's able to participate in this murder and then dispose of the body like trash?"

¶ 22     At the conclusion of the parties' arguments, the trial court announced its findings and re-imposed a 54-year sentence. It prefaced its remarks by noting that it had considered the facts of the case, the presentence investigation report, defendant's statements in allocution, the original sentencing hearing as stipulated, the victim impact statements, the mitigation report, the arguments of counsel, and the statutory factors in aggravation and mitigation, including the additional mitigating factors applicable to juvenile offenders under section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2018). It recognized that, under *Miller* and its progeny, children are less deserving of the most severe penalties because they have diminished culpability and greater prospects for reform. It noted, however, that subsequent to our decision in *Vatamaniuc I*, the United States Supreme Court issued *Jones v. Mississippi*, 593 U.S. ____, 141 S. Ct. 1307 (2021), which held that the eighth amendment "allows juvenile offenders to be sentenced to life without parole as long as the sentence is not mandatory and the sentencing court had discretion to consider

youth and attendant characteristics, but that no factfinding by the sentencer is required." *People v. Dorsey*, 2021 IL 123010, ¶ 40 (discussing *Jones*).

¶ 23    The court then recounted the testimony that two officers provided during the original March 2018 sentencing hearing. It noted that Officer Darren Graff of the Highland Park police department received a dispatch in August 2012 regarding suspicious subjects with pillowcases walking between houses. Defendant, Schenk, and a third individual were apprehended. Defendant was found to possess a large knife, a rubber glove, two GPS units, and an iPod. Defendant confessed that, while they were drinking alcohol, he asked the others if they wanted to make quick money by breaking into vehicles. The others agreed, and the group burglarized unlocked vehicles, from which defendant obtained the knife, the GPS units, and the iPod. The court also recounted the prior testimony of Officer Ed Biondi of the Highwood police department. During the very early morning in June 2013 (approximately 13 to 14 hours before Nutter's murder), he observed defendant, Schenk, and Coffee walking down the street. Coffee wore yellow surgical gloves, and Officer Biondi asked Coffee why he was wearing them. Coffee replied that it was cold outside and stated that they were headed to his house. Defendant and Schenk ran away in opposite directions and were not apprehended that night. The court also recounted the testimony of corrections officer Kim Crittendon of the Lake County sheriff's department. She testified that, from the time of defendant's arrest until the original sentencing hearing, defendant had 68 violations in the jail, including five violations for fighting.

¶ 24    After noting the Nutters' heartfelt victim impact statements, the judge turned her attention to the mitigation report. The court noted the discussion in the report of various aspects of defendant's life prior to the instant offense, including his home life where he felt isolated and abused by his older brother, educational background, and challenging school life due to bullying

and a lack of friends, anxiety, and the unheeded advice from a school psychologist that he seek counseling and mental health treatment. The court acknowledged Cashman's opinion that defendant was a "follower" who longed to be loved because of his feelings of isolation and limited contact with his parents, and that defendant sought the feeling of family with anyone who would accept him—including Schenk and Coffee. It noted Cashman's opinion that defendant would not reoffend because he was no longer self-medicating with alcohol and marijuana, and how Cashman was influenced by what she described as defendant's "extreme sincerity" whenever he would ask how Cashman was doing and whether there was anything he could do to help her. The court then highlighted what it considered to be a number of flaws in the mitigation report and in Cashman's methodology. It emphasized that Cashman was not familiar with all of the relevant facts regarding defendant and the offense, and she had failed to review the trial transcripts, the police reports related to the instant offense, and she did she watch the videotape of defendant's statements to the police.

¶ 25    The trial court also reiterated the testimony of defendant's parents from the original sentencing hearing, including his mother's testimony that she devastated defendant when she moved out of state, as well as his father's testimony that he worked long hours and was not at home much of the time defendant was growing up. Finally, the court reiterated the salient points of defendant's statements in allocution from both sentencing hearings.

¶ 26    It then considered the mitigating sentencing factors mandated under the youth sentencing provisions in section 5-4.5-105(a) of the Code, which were enacted following *Miller*. Concerning the first factor, defendant's "age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability," the court noted that defendant was "six months shy of [his] 18th

birthday" at the time of the murder, and it stated that defendant was essentially caring for himself at that point because his father was frequently absent from the home and his mother had moved away. The court did not find that defendant had any cognitive or developmental disability. Addressing defendant's impetuosity, the court stated that "impulsivity [*sic*] is something where you run into a store and steal cigarettes or candy or alcohol" and "not the planning of a murder, calling of the victim, luring him to a secluded area, leaving with your two co-defendants with a gun that you had played with, getting into the victim's car and the victim being shot in the back of the head." The court continued, stating that defendant "knew right from wrong," and that defendant appreciated the possibility that, by bringing a gun to meet Nutter, "someone would either be shot and killed or injured." The court further stated that defendant understood the risks of his participation in the offense because he had been arrested on two prior occasions, including the vehicle burglaries testified to by Officer Graff and possession of cannabis with intent to deliver.

¶ 27 Regarding the second factor, outside pressure, the court found that defendant acted voluntarily on the day of the murder as well as in the days that followed. It disagreed with Cashman's opinion that defendant was a "follower" who was afraid of Schenk, emphasizing that, after the shooting, he returned to Hahn's house several times, both with Schenk and Coffee, and of his own accord. It stated that these were "[n]ot the actions of someone afraid or a follower." It also noted that defendant had spent time with Schenk since at least August 2012, when defendant concocted a plan to make easy money by burglarizing vehicles with Schenk. Defendant "did just whatever [he] wanted."

¶ 28 The third factor, defendant's family and home environment, was also not mitigating. The court acknowledged that defendant was bullied at school, as well as at home by his older brother. However, it emphasized that even the mitigation report described defendant's parents as "loving,"

and the facts that his mother lived out of state and his father worked long hours did not "cause[]
[defendant] to commit murder." The fourth factor, the defendant's potential for rehabilitation, was
also not mitigating. It noted that, although the presentence investigation report (PSI)
recommended resources for defendant, such resources are included in "every [PSI] because the
purpose behind the statute is rehabilitation," but "that does not mean someone can be
rehabilitated." The sentencing judge stated that, although defendant expressed remorse in his
allocution statements, defendant was unable to "follow the simplest of rules in the Lake County
jail while he awaited trial," noting that he had 68 violations—five of which were for the serious
offense of fighting with other inmates.

¶ 29    The court appeared to consider the fifth and sixth youth sentencing factors, the
circumstances of the offense and the defendant's degree of participation in the offense, in tandem.
It reiterated that it was unable to find that defendant was the actual shooter, but it stated that
defendant was nevertheless an active participant in the murder because he "was there, planned it,
set it up, had the gun, and got in the car." The court recalled that, during his statement in allocution
during the original sentencing hearing, defendant apologized for not having the courage to save
Nutter, which the court viewed as confirming that defendant "knew it was going to happen and
*** did nothing to stop it." It further recounted that, after Nutter was murdered, defendant helped
"put the body in the trunk" and "dumped it on the side of the road."

¶ 30    The seventh factor, whether the defendant was able to meaningfully participate in his
defense, did not apply. The court stated that defendant was engaged throughout the proceedings,
was "capable [during the trial,]" and understood what [his] rights were and voiced [his] opinion."
The eighth factor, defendant's prior juvenile or criminal history, was mitigating, because he had
"no real criminal background other than the car burglary and the unlawful possession of cannabis

with intent to deliver."

¶ 31    The ninth factor allows the court to consider "any other information that the court finds relevant and reliable, including an expression of remorse, if appropriate. *Id*. § 5-4.5-105(a)(9). The trial court stated that it had observed defendant during the video of his interview with the police and in court, and it stated that defendant "had a complete disregard for human life," because Nutter's "life meant nothing to [defendant]." It continued that, after Nutter's life was "extinguished by execution," defendant "dumped his body like garbage." The court discounted defendant's statement of remorse, commenting: "by saying you're sorry and that you want to help people means you can be rehabilitated? I don't think so."

¶ 32    The trial court then indicated that it would exercise its discretion under section 5-4.5-105(b) of the Code and expressly declined to impose the 15-year firearm enhancement. It commented that the sentencing range for first-degree murder was therefore between 20 and 60 years, and found that, "based on all of the factors," defendant is "the rare individual who is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond rehabilitation." The trial court then resentenced defendant to 54 years' imprisonment.

¶ 33                                    II. ANALYSIS

¶ 34    As noted, defendant argues on appeal that (1) the reimposition of a 54-year sentence violates the statutory prohibition on increasing sentences on remand except for conduct occurring after the original sentencing hearing; and (2) the trial court abused its discretion in sentencing him to a *de facto* life sentence because, in defendant's view, the court misconstrued several of the sentencing factors and conducted an improper analysis. We address each issue in turn.

¶ 35         A. Whether Defendant's Sentence Violates Section 5-5-4(a) of the Code

¶ 36    On appeal, defendant first contends that the trial court abused its discretion in resentencing

him to 54 years' imprisonment because the sentence violates the statutory prohibition on increasing sentences on remand. As noted, defendant argued on direct appeal that the record failed to demonstrate that the sentencing judge was aware that the firearm enhancement was discretionary. *Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 88. In *Vatamaniuc I*, we vacated defendant's 54-year sentence but remanded the matter for a new sentencing hearing because the trial court failed to consider whether defendant was among the rarest of juvenile offenders whose crimes reflected permanent incorrigibility. *Vatamaniuc*, 2021 IL App (2d) 180379, ¶¶ 101, 110. Thus, it was unnecessary to address defendant's argument regarding the firearm enhancement, but we cautioned that the court should be mindful that its imposition was within its discretion. *Id.* ¶ 113. On remand, the court expressly declined to impose the 15-year firearm enhancement, but it nevertheless resentenced defendant to 54 years' imprisonment.

¶ 37    In the instant appeal, defendant contends that his sentence violates the statutory prohibition against the court imposing a more severe sentence on resentencing except for conduct occurring subsequent to the original sentence. Defendant acknowledges that the "total number of years of incarceration remained unchanged," but he maintains that the trial court nevertheless impermissibly "increased" his sentence on remand because, in his view, his original sentence consisted of "a 39-year base sentence for first-degree murder and a 15-year firearm enhancement," whereas his new sentence consists of a 54-year base sentence and no enhancement. Defendant concludes that the sentencing judge "remov[ed] the 15-year sentencing enhancement [but] *** increased his base sentence by 15 years."

¶ 38    Section 5-5-4(a) of the Code governs resentencing on remand. It provides:

    "Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different

offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." 730 ILCS 5/5-5-4(a) (West 2020).

¶ 39     The "purpose of section 5-5-4 of the Code is to ensure the due process rights set forth in [*North Carolina v.*] *Pearce* by preventing vindictiveness in resentencing a defendant for having exercised his appeal rights or his right to file a post-judgment motion." *People v. Woolsey*, 278 Ill. App. 3d 708, 710 (1996); citing *North Carolina v. Pearce*, 395 U.S. 711 (1969). See also *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort").

¶ 40     Defendant relies exclusively on our supreme court's holding in *People v. Kilpatrick*, 167 Ill. 2d 439 (1995), in support of his argument that the trial court improperly increased the unenhanced portion of his sentence on remand. In *Kilpatrick*, the defendant was originally sentenced to consecutive terms of six years' imprisonment and nine years' imprisonment for home invasion and attempted murder, respectively. *Id*. at 441. The defendant moved to reconsider, arguing that the imposition of consecutive sentences was unwarranted. *Id*. The court granted the motion and vacated the defendant's sentences, but it then imposed a "single sentence" of 15 years' imprisonment on the two offenses. *Id*. On review, the supreme court held that the court had "impermissibly increased the sentences for defendant's two convictions, from six and nine years for each offense, to 15 years' incarceration," in violation of what was then section 5-8-1(c) of the Code (730 ILCS 5/5-8-1(c) (West 1992)), which prohibited an increase in sentence following a motion to reduce. *Kilpatrick*, 167 Ill. 2d at 447. The court also emphasized the well-settled rule that consecutive sentences are not treated as a single sentence and that section 5-8-1(c) prohibits a

sentencing increase once a sentence has been imposed. *Id*. at 446. Thus, the court found that it was immaterial that "the total number of years' imprisonment remained the same," because the fact remained that the "defendant's sentence was increased, from either six or nine years' incarceration to 15 years." *Id*. In reaching its holding, the court was expressly persuaded by *People v. Rivera*, 212 Ill. App. 3d 519, where we held that a trial court could not increase a defendant's sentence on review, even if the defendant's total number of years' incarceration remained the same. *Kilpatrick*, 167 Ill. 2d at 445-46.

¶ 41    Defendant asserts that the "same reasoning should apply in this case." He emphasizes that, in his direct appeal, he challenged his 54-year sentence, in part, because the record suggested that the trial court was unaware that the imposition of the 15-year firearm enhancement was discretionary. See *Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 88. Defendant contends that, because his sentence was vacated and the matter remanded for a new sentencing hearing, his "underlying sentence of 39 years should not have been increased *** to make up for the fact that the judge [in her discretion] did not impose the add-on." Defendant contends that, here, "[t]he judge's action is exactly like that of the [sentencing] judge in *Kilpatrick*, who made the defendant's sentences concurrent, but then raised each sentence to 15 years so that the total years of imprisonment remained the same."

¶ 42    *Kilpatrick* is distinguishable from the instant matter and therefore does not support defendant's argument. *Kilpatrick*, as discussed, involved a defendant who was originally sentenced to *consecutive* sentences of six years and nine years but, on reconsideration, was resentenced to a single 15-year sentence for both offenses. *Kilpatrick*, 167 Ill. 2d at 441. In other words, the sentencing court increased a single sentence to make up for the lack of consecutive sentencing. Our supreme court found this circumstance constituted an impermissible increase in

the defendant's sentence, notwithstanding the fact that the total number of years' incarceration upon resentencing (15 years) was the same as the aggregate of the previously imposed consecutive sentences (six years and nine years). Conversely, here, the trial court's oral pronouncement of defendant's original sentence and the written sentencing order make clear that it entered a single sentence of 54 years on count two, first-degree murder. Defendant points to nothing in the record to suggest that the court imposed two distinct sentences—one 39-year sentence for first-degree murder and a separate 15-year sentence for the firearm enhancement. The *Kilpatrick* court's concerns regarding *consecutive* sentencing are simply not implicated here.

¶ 43 Defendant's argument represents an attempt to transmute his original 54-year sentence for first-degree murder into consecutive sentences of 39-years for the underlying offense and 15-years for the firearm enhancement in order to invoke *Kilpatrick* and argue that his sentence following the remand is more severe than his original sentence. However, defendant cites no authority, nor did our research reveal any, to support his implied argument that a single sentence that includes a statutory enhancement should be treated as an aggregate sentence, with each component analyzed as a discrete sentence, for purposes of evaluating compliance with section 5-5-4(a). If anything, the opposite is true. In *People v. Barnes*, 364 Ill. App. 3d 888 (2006), the appellate court recognized that a trial court's original sentence constitutes a single sentence that is not reducible to component parts. There, the defendant was originally sentenced to 25 years for attempted murder, or 10 years for the underlying offense and 15 years for a firearm enhancement. *Id*. at 893. The defendant moved to reconsider his sentence, correctly noting that the particular enhancement at issue had been ruled unconstitutional. *Id*. The trial court granted the defendant's motion to reconsider his 25-year sentence and resentenced him to 17 years' imprisonment. *Id.* On appeal, the defendant argued that his 17-year sentence constituted an improper sentencing increase. *Id*. at

898. The appellate court rejected the argument, noting that, because the 17-year term imposed after resentencing was less than the original 25-year sentence, the "argument necessarily presumes that the trial court's recognition of the invalidity of the enhancement statute left a valid 10-year sentence which could not then be increased. We do not agree with this presumption." *Id*. at 897. The *Barnes* court also stated that, although the trial court had referred to the sentence in terms of its component parts, "neither the language of the [enhancement] statute nor the trial court's ultimate pronouncement of sentence suggests that the penalty imposed for attempted murder consisted of distinct, independent prison terms rather than a single 25-year sentence." *Id*. at 888. Additionally, *Barnes* noted that the use of an unconstitutional sentencing enhancement rendered the sentence voidable, and "our supreme court has held that only valid sentences may serve as the baseline for assessment of compliance with prohibitions against increase." *Id*. at 898. Accordingly, the *Barnes* court found the imposition of a 17-year term to be proper following the vacation of the defendant's 25-year sentence, which had included an unconstitutional 15-year enhancement.

¶ 44     *Barnes* cited with approval the remedy analysis in *People v. Ridley*, 345 Ill. App. 3d 1091, 1092 (2004), *vacated on other grounds*, to refute the defendant's argument that *People v. Baker*, 341 Ill. App. 3d 1083 (2003), mandated that where a sentencing enhancement is deemed invalid the court must vacate it and leave undisturbed the base sentence. In *Ridley*, the defendant was convicted of armed robbery and sentenced to 21 years' imprisonment, which consisted of 6 years for the underlying offense and a 15-year enhancement. The appellate court affirmed the defendant's conviction but, in light of a recent supreme court holding, vacated the 15-year enhancement and remanded the matter for resentencing. On remand, the defendant received a 15-year sentence. Defendant appealed, arguing that the trial court should have sentenced him to six

years by simply subtracting the invalid enhancement from the original sentence. *Id.* at 1092-93. The defendant pointed to *Baker*, 341 Ill. App. 3d 1083 (vacating 15-year enhancement and remanding with directions to impose a 25-year sentence where the original sentence was 40 years), which he argued mandated such a result. The court in *Ridley* rejected the defendant's argument. It emphasized that the *Baker* court exercised its authority under Supreme Court Rule 615(b) and did not prohibit a reviewing court from remanding for a new sentencing hearing. *Id.* at 1094. Ultimately, the *Ridley* court affirmed the imposition of a 15-year sentence following the vacation of a 21-year sentence that included an invalid 15-year enhancement. *Ridley*, 345 Ill. App. 3d at 1093-94; *Barnes*, 364 Ill. App. 3d at 897.

¶ 45 Defendant attempts to distinguish *Barnes* and *Ridley* on the grounds that, in those cases, the defendants were resentenced after the firearm enhancement included in their respective sentences was found to be unconstitutional, whereas here, the sentencing judge on remand opted to exercise her discretion to not impose a valid enhancement. He emphasizes that section 5-5-4(a) was held not to apply to those cases, because the use of an unconstitutional sentencing enhancement renders a sentence voidable, and "our supreme court has held that only valid sentences may serve as the baseline for assessment of compliance with prohibitions against [sentencing] increase[s]." *Barnes*, 354 Ill. App. 3d at 898. In other words, "section 5-5-4 of the Code does not apply to the correction of an illegal sentence," but rather, it applies only "to an original sentence within statutory limits imposed upon an erroneously obtained conviction or to an original sentence within statutory limits later held to have been obtained or aggravated in error." *People v. Woolsey*, 278 Ill. App. 3d 708, 710 (1996). Defendant emphasizes that, here, section 5-5-4(a) *does* apply, presumably because his original sentence did not include an unconstitutional sentencing enhancement, as was the case in *Barnes* and *Ridley*.

¶ 46    Defendant's argument rests on a distinction without a difference. Section 5-5-4(a) is implicated where an original sentence is valid, but that circumstance does not automatically mean that section 5-5-4(a) is violated. To find a violation, the new sentence must be "more severe than the prior sentence" and not based on any conduct of defendant occurring after the original sentencing. 730 ILCS 5/5-5-4(a) (West 2020). Defendant's new sentence is not more severe than his prior sentence. His original sentence was a single, unitary, 54-year sentence based on a single count and, after this court vacated that sentence, defendant again received a single, unitary, 54-year sentence based on a single count. The sentences were both within the statutory range of 20 to 60 years for first-degree murder without any enhancement. *Barnes*, in particular, informs our determination, not because of its analysis concerning the inapplicability of "no increase" provisions to invalid original sentences, but because of its conclusion that an original sentence within statutory limits that is increased by an enhancement results in a single sentence and not "distinct, independent prison terms." *Barnes*, 364 Ill. App. 3d at 897. Indeed, defendant fails to even acknowledge this proposition in his appellate briefs. Because defendant received on remand a sentence identical to that imposed in the original sentencing hearing, the trial court did not violate section 5-5-4(a) of the Code by reimposing a 54-year sentence.

¶ 47        B. Whether the Sentencing Determination Constitutes an Abuse of Discretion

¶ 48    Defendant next argues that the trial court abused its discretion in imposing a 54-year *de facto* life sentence. Specifically, he asserts that the court erred by "ignoring guidance from this Court" in *Vatamaniuc I*, erred in its application of the statutory factors in mitigation set forth in section 5-4.5-105(a) of the Code, and erroneously found that defendant is the "rare individual who is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond rehabilitation." Defendant requests that we vacate his sentence and remand for a new sentencing hearing before a

different judge or, in the alternative, reduce his sentence by 15 years. We determine that the trial court did not abuse its discretion in imposing a 54-year sentence.

¶ 49 It is well established that the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This is so because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. Still, the court's discretion in fashioning an appropriate sentence is not limitless. *Stacey*, 193 Ill. 2d at 209. The weight the court should attribute to each factor in aggravation and mitigation depends on the circumstances of each case. *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990). As long as the court "does not consider incompetent evidence, improper aggravating factors, or ignore pertinent mitigating factors, it has wide latitude in sentencing a defendant to any term within the statutory term prescribed for the offense." *Id.* The trial court is not required to recite and assign value to each factor during a sentencing hearing. *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011). We may not substitute our judgment for that of the trial court merely where we would have weighed the factors differently. Absent an abuse of discretion by the trial court, a sentence may not be altered on review. *Stacey*, 193 Ill. 2d at 210. A sentence that is within statutory limits will be deemed excessive and an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Id*.

¶ 50 A sentencing court must consider the relevant statutory factors in mitigation and aggravation in sections 5-5-3.1 and 5-5-3.2(a) of the Code (730 ILCS 5/5-5-3.1, 5-5-3.2(a) (West 2020)), as well as additional factors in mitigation listed in section 5-4.5-105(a) of the Code if the defendant was a juvenile at the time of the offense.

¶ 51    In *Miller,* 567 U.S. at 479, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." It reasoned that such a mandatory sentencing scheme is unconstitutional because it would preclude the sentencing judge from considering a juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id*. at 477. It emphasized that "children are constitutionally different from adults for purposes of sentencing," and it outlined several such differences. *Id*. at 471. First, juveniles are more immature and irresponsible than adults. *Id*. Second, juveniles are more vulnerable to negative influences and outside pressures from their family and peers. Third, their characters are not yet fully formed, and their traits are less fixed, such that their illegal conduct is less indictive of irretrievable depravity. Therefore, it reasoned that juveniles are less deserving of the most severe punishments because they have greater prospects for reform. *Id. Miller* did not outright prohibit a sentence of life without parole for juveniles, but it instead mandated that the trial court consider "an offender's age and the wealth of characteristics and circumstances attendant to it" before imposing such a sentence. *Id.* at 476. *Miller* also made clear that its holding mandated only "a certain process—considering an offender's youth and attendant characteristics," before imposing a life sentence. *Id.* at 483. In other words, the trial court is required to consider, as mitigating circumstances, the juvenile's "age and age-related characteristics and the nature of their crimes." *Id*. The Supreme Court later held that *Miller* applies retroactively, and it emphasized that, although *Miller* did not bar life without parole for *all* juveniles, it "did bar life without parole *** for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." See *Montgomery v. Louisiana*, 577 U.S. 190, 206, 209 (2016). The Supreme

Court further explained that *Miller* "drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Id*. at 208.

¶ 52    Subsequent to *Miller* and *Montgomery*, the Illinois Supreme Court expanded *Miller* to apply to juveniles who receive mandatory *de facto* life sentences, meaning "[a] mandatory term-of-years sentence that cannot be served in one lifetime." *People v. Reyes*, 2016 IL 119271, ¶ 9.  It later defined a *de facto* life sentence for a juvenile offender as being greater than 40 years' imprisonment.  *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42.

¶ 53    In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court expanded *Miller* and held that, in addition to mandatory life sentences, *Miller* applies to discretionary life sentences.  In support of its holding, it relied on the sweeping language used in *Miller*, which the supreme court observed "is significantly broader than its core holding" and is not "specific to only mandatory life sentences." *Id*. ¶ 38.  Thus, the *Holman* court held that "*Miller* applies to discretionary sentences of life without parole for juvenile defendants (*id*. ¶ 40), and that such a defendant "may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" (*id*. ¶ 46).  It continued that the sentencing court may make that determination "only after considering the defendant's youth and its attendant characteristics," and it provided a non-exhaustive list of factors for the sentencing court to consider, namely:

> "(1) the juvenile defendant's chronological age at the time of the offense and any evidence
>
> of his particular immaturity, impetuosity, and failure to appreciate risks and consequences;
>
> (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's
>
> degree of participation in the homicide and any evidence of familial or peer pressures that

may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 54    *Holman* also noted that "consideration of the *Miller* factors is consistent with section 5-4.5-105 of the [Code]." This statute requires the sentencing court to consider additional factors in mitigation when sentencing a defendant who was under 18 years of age at the time of the offense, namely:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history;

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make

a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2020).

¶ 55    Subsequent to *Holman*, the United States Supreme Court issued its decision in *Jones*, 593 U.S. ____, 141 S. Ct. 1307 (2021). There, the court held that the eighth amendment does not require trial courts to make an express finding that the defendant is permanently incorrigible or provide an on-the-record explanation for the sentence with an implicit finding of permanent incorrigibility before sentencing a juvenile offender to life without parole. Instead, the eighth amendment allows for the imposition of a sentence of life without parole on a juvenile offender as long as the sentence is not mandatory, and the sentencing court had discretion to consider youth and attendant characteristics. *Dorsey*, 2021 IL 123010, ¶ 40 (discussing *Jones*).

¶ 56    Our supreme court, in *Dorsey*, 2021 IL 123010, ¶ 41, commented that its holding in *Holman* "that *Miller* and *Montgomery* apply to discretionary life without parole sentences" imposed on juvenile offenders is "questionable in light of *Jones*." Indeed, as this court recently recognized, "[g]iven the court's comments in *Dorsey*, it is now questionable whether *Miller's* principles could ever apply to a discretionary life sentence." *People v. Howard*, 2021 IL App (2d) 190695, ¶ 51.

¶ 57    In the instant case, however, we need not substantively address the viability of *Holman* in the wake of *Jones*. This is so because, notwithstanding his citation to *Miller*, defendant raises no constitutional (eighth amendment or otherwise) challenge to his sentence. Instead, he challenges the trial court's application of the statutory factors in section 5-4.5-105(a) of the Code and asserts that the trial court "ignore[ed] guidance from this Court" in *Vatamaniuc I* in finding that he is the "rare individual who is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond rehabilitation." In defendant's view, there was ample evidence that his participation in the

offense can be attributed to the hallmark characteristics of youth and that he is capable of rehabilitation.

¶ 58    The State concedes that defendant's 54-year sentence constitutes a *de facto* life sentence under *Buffer*, 2019 IL 122327 (holding that a prison sentence of more than 40 years imposed on a juvenile offender is a *de facto* life sentence), but it maintains that the sentence did not result from an abuse of the sentencing judge's discretion.

¶ 59    We agree with the State.  Consistent with our instruction that the trial court "make a more thorough record of how it weighs each of the relevant factors in evaluating defendant's youth and its attendant circumstances" (*Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 110), the trial court, on remand, thoroughly evaluated each of the nine mitigating youth sentencing factors in section 5-4.5-105(a) of the Code and explained how those factors applied to defendant.  Defendant argues that the court merely paid "lip service" to the factors, but the record belies defendant's assertion. The trial court's findings in this regard comprise over 16 pages of the report of proceedings.  It spoke at length concerning defendant's youth, including whether he was subjected to outside pressure, his home and family environment, the circumstances of the offense and defendant's participation therein, his prior criminal history, and his ability to meaningfully participate in his defense.

¶ 60    Defendant challenges the trial court's application of several sentencing factors.  These arguments amount to little more than an invitation to reweigh the factors, which we may not do. *Stacey*, 193 Ill. 2d at 209 (2000) ("reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently").  To the extent defendant's arguments do not ask us to reweigh the factors, we address his claims of error below.

¶ 61    Defendant argues that the court misapplied the statutory factor concerning defendant's impetuosity and level of maturity at the time of the offense. See 730 ILCS 5/5-4.5-105(a)(1) (West 2020). In addressing this factor, the trial court commented that "[i]mpulsivity is something where you run into a store and steal cigarettes or candy or alcohol" and "not the planning of a murder, calling of the victim, leaving with your two co-defendants with a gun that you had played with, getting into the victim's car, and the victim being shot in the back of the head." Defendant claims that the court misconstrued this factor because the factor is applicable to *all* juvenile offenders, including those who commit first-degree murder, rather than only those juveniles who commit minor offenses, such as shoplifting candy from a store.

¶ 62    Defendant's argument is misguided. In discussing this factor, the trial court emphasized the *planning* of the offense, as opposed to the commission of the offense. The planning of an offense certainly has bearing on the person's impetuosity at the time of the offense, as contemplated in section 5-4.5-105(a)(1). Defendant is correct that the record does not suggest that he and his "co-defendants spent considerable time discussing committing [the] crime or carefully weighing the pros and cons of committing the offense." Still, this sentencing factor does not suggest that "considerable time" must have been spent in planning the offense in order for the trial court to properly conclude that the offense did not stem from the juvenile offender's impetuosity. We also see nothing improper with the court's comments that defendant "knew right from wrong" and understood the risks and consequences of his participation in the offense. The statements related to defendant's age (6 months shy of 18 years of age), lack of any cognitive or developmental disability, and defendant's prior encounters with law enforcement, which were all fair comments on defendant's circumstances.

¶ 63    Defendant also argues that the trial court erred in its application of whether he was vulnerable to outside pressure, including from family and peers. See 730 ILCS 5/5-4.5-105(a)(2) (West 2020). Defendant emphasizes that Cashman, in her mitigation report, described him as a "follower" who spent time with "whatever friends would accept him," including those that were negative influences. The court, in discounting this factor, noted that defendant and Schenk were caught burglarizing cars in August 2012, which the court stated Cashman failed to account for in her report. Defendant argues that the naked fact of his apprehension with Schenk relative to the burglaries does not support the court's finding that defendant was not vulnerable to peer pressure from Schenk. The argument overlooks the fact that defendant confessed to originating the idea to burglarize the vehicles, and this circumstance demonstrates that defendant had previously instigated the commission of an illegal act which Schenk apparently agreed to participate in. The trial court reasonably viewed these circumstances as being contrary to the acts of a "follower."

¶ 64    Lastly, defendant takes issue with the court's application of the ninth youth sentencing factor, which allows for the consideration of "any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." *Id.* § 5-4.5-105(a)(9). Defendant acknowledges that the trial court expressly considered defendant's allocution from the original sentencing hearing and the resentencing hearing. Nevertheless, he maintains that the court erred because it thereafter "focus[ed] on the offense and the immediate aftermath" and made comments such as "[Nutter's] life meant nothing to you." He also points to the trial court's statement that "[y]ou dumped his body like garbage, and by saying you're sorry and that you want to help people means you can be rehabilitated? I don't think so." Defendant argues that, by again focusing on the offense, the court improperly conflated its analysis of the ninth factor with the fifth and sixth

factors, which pertain to the circumstances of the offense (*id*. § 5-4.5-105(a)(5) (West 2020)) and defendant's degree of participation in the offense (*id*. § 5-4.5-105(a)(6)), respectively.

¶ 65 We reject defendant's argument. The report of proceedings reveals that the trial court's comments concerning defendant's expression of remorse were limited to its statement that it did "take into consideration [defendant's] statement both in 2018 and here this afternoon, and your expression of remorse." No error accrued by the brevity of the court's comment on this factor because it is unnecessary for the court to specifically address each factor or assign value to each factor on the record. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74. Moreover, the statements defendant complains of do not suggest any conflation of the factors. Rather, the statements were a prelude to the court's finding that defendant is "the rare individual who is irretrievably depraved, permanently incorrigible or irreparably corrupt beyond rehabilitation." We perceive no error.

¶ 66 In a similar vein, defendant argues that the trial court's analysis was flawed because it "ignore[ed] guidance from this Court" regarding how the sentencing factors should have been weighed on remand. Indeed, he raises this assertion repeatedly throughout his briefs. Contrary to defendant's view, we offered no such guidance regarding how the trial court should weigh any of the sentencing factors. This much should have been clear based on our statement in *Vatamaniuc I* that "[w]e express no opinion as to what sentence defendant should receive on remand." *Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 111. Defendant highlights our statement in *Vatamaniuc I* that, during the original sentencing hearing, there was "no indication that the circuit court specifically considered the recommendation included in the PSI that defendant 'seek substance abuse/mental health/or any educational or vocational programing available.' " Although we stated that the recommendations in the PSI suggested that defendant would benefit from those services

(*id*.), the sentencing judge on remand determined, within her discretion, that any such benefit would be limited. In announcing its findings at the resentencing hearing, the trial court stated that, "[i]n every presentence investigation [report], because the purpose behind the statute is rehabilitation, resources are included *** that would help rehabilitate. But that does not mean someone can be rehabilitated." Again, the trial court is in the best position to consider defendant's prospects for rehabilitation because it can observe defendant firsthand, whereas the reviewing court must rely on the cold record. *People v. Fern*, 189 Ill. 2d 48, 53 (1999).

¶ 67 Similarly, defendant argues that the trial court "largely ignored this Court's guidance" regarding Cashman's ultimate opinion that defendant would not reoffend because he was no longer self-medicating with drugs and alcohol. See *Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 107. Defendant interprets our comment regarding the trial court's failure to acknowledge Cashman's opinion in the first sentencing hearing as a tacit endorsement of that opinion by this court. Defendant is mistaken. Again, we did not state in our prior disposition *how* the trial court should weigh any of the youth sentencing factors, including the factor pertaining to rehabilitative potential. See 730 ILCS 5/5-4.5-105(a)(4) (West 2018). Rather, we made clear that Cashman's ultimate opinion, "*if accepted* by the court," would weigh against the imposition of a *de facto* life sentence. (Emphasis added.) *Vatamaniuc I*, 2021 IL App (2d) 180379, ¶ 107. On remand, the court discussed the mitigation report at length and expressly disagreed with the opinion that defendant would not reoffend, reasoning that Cashman was unfamiliar with the facts of the offense and defendant was unable to "follow the simplest of rules" by refraining from violent and improper behavior while he awaited trial in the Lake County jail. Defendant points out that all of the jail violations occurred between the ages of 17 to 22, when he was an "emerging adult," and he contends that "it is impossible to base [defendant's] potential [for] rehabilitation on his childish

behavior in jail." Defendant cites no case to support his argument that it was improper for the court to consider his conduct in jail as evidence of his lack of rehabilitative potential and, thus, his contention is forfeited. See *In re People v. Sprind*, 403 Ill. App. 3d 772, 778-79 (2010) (the failure to cite legal authority forfeits the issue for review). The trial court properly weighed the sentencing factors, and defendant's sentence is not greatly at variance with the spirit or purpose of the law, or manifestly disproportionate to the nature of the offense. Accordingly, we find no abuse of discretion in defendant's 54-year sentence for first-degree murder.

¶ 68                                    III. CONCLUSION

¶ 69    For the above reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 70    Affirmed.